2014-1789
(Opposition No. 91195604)

In The
# United States Court of Appeals
For The Federal Circuit

## JACK WOLFSKIN AUSRUSTUNG FUR DRAUSSEN GMBH & COMPANY KGAA,

*Appellant*,

v.

## NEW MILLENNIUM SPORTS, S.L.U.,

*Appellee*.

APPEAL FROM THE UNITED STATES PATENT AND
TRADEMARK OFFICE, TRADEMARK TRIAL AND APPEAL BOARD

––––––––––––––––

## BRIEF OF APPELLANT

––––––––––––––––

Richard Lehv
Robert A. Becker
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
First Avenue & 48th Street
New York, New York 10017
(212) 813-5900 (Telephone)
(212) 813-5901 (Facsimile)
rlehv@fzlz.com
rbecker@fzlz.com

*Counsel for Appellant*

Form 9

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Jack Wolfskin Ausrustung Fur Draussen GmbH & Company KGaA  v.  New Millennium Sports, S.L.U.

No. 14-1789

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) appellant _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Jack Wolfskin Ausrustung Fur Draussen GmbH & Company KGaA

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not Applicable

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

The parent corporation of Appellant is Skyrager GmbH, which is ultimately owned by Blackstone Capital Partners VI L.P., a unit of The Blackstone Group L.P., which is a publicly-traded entity (NYSE: BX).

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Fross Zelnick Lehrman & Zissu, P.C.; Richard Z. Lehv, Esq.; Robert A. Becker, Esq.

September 24, 2014
_____
Date

_Richard Lehv_

Signature of counsel

Richard Z. Lehv
_____
Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

I.      STATEMENT OF RELATED CASES ........................................... 1

II.     JURISDICTIONAL STATEMENT ................................................ 1

III.    STATEMENT OF THE ISSUES ................................................... 1

IV.     STATEMENT OF THE CASE ...................................................... 2

        Statement of Facts ........................................................................ 3

        The Board's Decision on the Opposition ...................................... 5

V.      SUMMARY OF ARGUMENT ..................................................... 7

VI.     ARGUMENT ............................................................................... 8

        A.    The Standard of Review .................................................... 8

        B.    The marks at issue must be compared in their entireties, and the
              Opposer's Mark may not be dissected .................................... 9

        C.    The Board improperly dissected Opposer's Mark .............. 14

        D.    There is no evidence in the record to support the Board's
              rationale for dissecting Opposer's Mark ............................ 16

        E.    The design portion of Opposer's Mark is weak, based on
              extensive third-party use and registration ........................... 22

        F.    The paw design that Opposer uses with its KELME brand is
              materially different from the Applicant's Mark ................... 29

        G.    Because of the differences between the parties' marks, this
              Court should weigh the *du Pont* factors *de novo* and find that
              confusion between the marks is not likely .......................... 32

VII.   THE BOARD'S DECISION ON THE COUNTERCLAIM SHOULD
       ALSO BE REVERSED ...................................................................................36

       Background ................................................................................................36

       A.    The Standard of Review ...................................................................37

       B.    The Replacement Mark constitutes a material alteration of
             Opposer' Mark, so the Mark has been abandoned and the
             Registration must be cancelled...........................................................39

VIII.  CONCLUSION............................................................................................42

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Big O Tires*, *Inc. v. 67 & Latham*, *L.L.C.*,
    Opp. Nos. 91178685 & 91178688 (T.T.A.B. Nov. 18, 2008)........................35

*CBS Inc. v. Morrow*,
    708 F.2d 1579 (Fed. Cir. 1983)......................................................................10

*Champagne Louis Roederer*, *S.A. v. Delicato Vineyards*,
    148 F.3d 1373 (Fed. Cir. 1998)......................................................................33

*China Healthways Institute*, *Inc. v. Wang*,
    491 F.3d 1337 (Fed. Cir. 2007)......................................................................14

*Coach Services*, *Inc. v. Triumph Learning L.L.C.*,
    668 F.3d 1356 (Fed. Cir. 2012)........................................................................9

*DuoProSS Meditech Corp. v. Inviro Medical Devices*, *Ltd.*,
    695 F.3d 1247 (Fed. Cir. 2012)..........................................................18, 19, 29

*Estate of P.D. Beckwith*, *Inc. v. Commissioner of Patents*,
    252 U.S. 538 (1920)..........................................................................................9

*Ex parte Kadane-Brown*, *Inc.*,
    79 U.S.P.Q. 307 (Comm'r Pat. 1948) ............................................................38

*Franklin Mint Corp. v. Master Manufacturing Co.*,
    667 F.2d 1005, 212 U.S.P.Q. 23 (C.C.P.A. 1981)...........................................9

*Hewlett-Packard Co. v. Packard Press*, *Inc.*,
    281 F.3d 1261 (Fed. Cir. 2002)........................................................................8

*In re Broadway Chicken*, *Inc.*,
    38 U.S.P.Q.2d 1559 (T.T.A.B. 1996)..............................................................23

*In re Dakin's Miniatures, Inc.*,
    59 U.S.P.Q.2d 1593 (T.T.A.B. 1999) .............................................................. 11

*In re Dial-A-Mattress Operating Corp.*,
    240 F.3d 1341 (Fed. Cir. 2001) ............................................................. 18, 37

*In re E.I. du Pont de Nemours & Co.*,
    476 F.2d 1357 (C.C.P.A. 1973) ....................................................................... 8

*In re Gartside*,
    203 F.3d 1305, 53 U.S.P.Q.2d 1769 (Fed. Cir. 2000) ..................................... 8

*In re Lucky Co.*,
    209 U.S.P.Q. 422 (T.T.A.B. 1980) ........................................................... 23, 24

*In re National Data Corp.*,
    753 F.2d 1056, 224 U.S.P.Q. 749 (Fed. Cir. 1985) ..................................... 9, 14

*In re Paramount Pictures Corp.*,
    213 U.S.P.Q. 1111 (T.T.A.B. 1982) .............................................................. 24

*In re United States Shoe Corp.*,
    229 U.S.P.Q. 707 (T.T.A.B. 1985) ................................................................ 21

*In re Viterra Inc.*,
    671 F.3d 1358 (Fed. Cir. 2012) ......................................................... 9, 10, 11

*Keebler Co. v. Murray Bakery Products*,
    866 F.2d 1386 (Fed. Cir. 1989) .................................................................... 35

*Kellogg Co. v. Pack'em Enterprises Inc.*,
    21 U.S.P.Q.2d 1142 (Fed. Cir. 1991) ...................................................... 33, 34

*Magnaflux Corp. v. Sonoflux Corp.*,
    231 F.2d 669 (C.C.P.A. 1956) ...................................................................... 34

*Missiontrek Ltd. v. Onfolio, Inc.*,
    80 U.S.P.Q.2d 1381 (T.T.A.B. 2005) ............................................................ 35

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
    331 F. Supp. 2d 1214 (C.D. Cal. 2004), *aff'd*,
    114 F. App'x 921 (9th Cir. 2004) .................................................. 25

*Odom's Tennessee Pride Sausage, Inc. v. FF Acquisition, L.L.C.*,
    600 F.3d 1343 (Fed. Cir. 2010) ............................................... 34-35

*Official Airline Guides, Inc. v. Goss*,
    6 F.3d 1385 (9th Cir. 1993) ......................................................... 14

*On-Line Careline, Inc. v. America Online, Inc.*,
    229 F.3d 1080 (Fed. Cir. 2000) ................................................ 8, 17

*Pameco-Aire, Inc. v. Lantz International Corporation*,
    196 U.S.P.Q. 260 (T.T.A.B. 1977) .................................. 11, 12, 13

*RA Brands, L.L.C. v. Pure Fishing, Inc.*,
    Opp. No. 91120088, 2002 WL 1022539 (T.T.A.B. May 15, 2002) .............. 13

*Recot, Inc. v. Becton*,
    214 F.3d 1322 (Fed. Cir. 2000) ................................................ 8, 14

*Red Bull GmbH v. American Baseball Co.*,
    Opp. Nos. 91150958 & 91150961 (T.T.A.B. May 21, 2004) ....................... 15

*Sears Mortgage Corp. v. Northeast Savings F.A.*,
    24 U.S.P.Q.2d 1227 (T.T.A.B. 1992) ........................................... 35

*Truescents L.L.C. v. Ride Skin Care L.L.C.*,
    81 U.S.P.Q.2d 1334 (T.T.A.B. 2006) ........................................... 35

*University of South Carolina v. University of Southern California*,
    367 F. App'x 129 (Fed. Cir. 2010) ......................................... 19, 29

*Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*,
    926 F.2d 1156 (Fed. Cir. 1991) ................................................. 40

## STATUTES

5 U.S.C. § 706(2)(e) ................................................................................8

15 U.S.C. § 1067 ....................................................................................1

15 U.S.C. § 1071(a)(1) ...........................................................................1

15 U.S.C. § 1071(a)(2) ...........................................................................1

28 U.S.C. § 1295(a)(4)(B) .......................................................................1

## REGULATION

37 C.F.R. § 2.145(d)(1) ...........................................................................1

## TRADEMARK MANUAL OF EXAMINING PROCEDURE

TMEP § 1609.02 ....................................................................................38

## TREATISES

J. Gilson,
    *Trademark Protection and Practice* (1990)....................................................40

J. Thomas McCarthy,
    *McCarthy on Trademarks and Unfair Competition* (4th ed. 2014).....9, 10, 14

# I.    STATEMENT OF RELATED CASES

There are no pending cases relating to this case.

# II.    JURISDICTIONAL STATEMENT

This appeal involves an opposition proceeding decided by the Trademark Trial and Appeal Board (the "Board"), which had jurisdiction over the opposition proceeding under Section 17 of the Lanham Act, 15 U.S.C. § 1067. This Court has jurisdiction over the appeal of the Board's ruling in the opposition proceeding, which was a final order that disposed of all parties' claims, under Section 21(a)(1) of the Lanham Act Section, 15 U.S.C. § 1071(a)(1), and 28 U.S.C. § 1295(a)(4)(B).  The Board's decision was issued on June 10, 2014, and Appellant's Notice of Appeal was timely filed on July 22, 2014 under Section 21(a)(2) of the Lanham Act Section, 15 U.S.C. § 1071(a)(2), and 37 C.F.R. § 2.145(d)(1).

# III.    STATEMENT OF THE ISSUES

1.  Whether confusion is likely between the mark shown in Appellant's Application Ser. No. 77/823,794, only for the goods listed in Class 25 of that Application, and the mark shown in Appellee's Reg. No. 1,856,808 for the goods listed in that Registration.

2.  Whether Appellee's Reg. No. 1,856,808 must be cancelled on the ground of abandonment.

## IV.    STATEMENT OF THE CASE

Appellant/applicant/counterclaimant, Jack Wolfskin Ausrustung fur

Draussen GmbH & Co. KGaA ("Applicant"), seeks reversal of the Trademark Trial

and Appeal Board's June 10, 2014 decision.  In that decision, which is published

only at 2014 WL 2997637, the Board sustained the opposition filed by appellee/-

opposer/counterclaim defendant, New Millennium Sports, S.L.U. ("Opposer"), to

Application Ser. No. 77/823,794, for an animal paw design, for use on various

items of clothing and footwear. Opposer alleged that Applicant's mark was likely

to cause confusion with the mark shown in Opposer's Registration No. 1,856,808,

namely, a composite mark consisting of the brand KELME and a paw design. Even

though (a) Applicant does not use a mark remotely similar to KELME, (b) there are

dozens of paw designs registered or in use for clothing items, and (c) Opposer

conceded that it has not used the mark shown in its registration in ten years, the

Board found a likelihood of confusion.

The Board's decision sustaining the opposition was in error because the

Board failed to compare Opposer's composite mark as a whole – the dominant

portion of which is KELME – and instead improperly dissected Opposer's mark,

by considering only the design portion of that mark.

The Board also dismissed Applicant's counterclaim for cancellation of

Opposer's pleaded registration, holding that Opposer had not abandoned its

registered mark.  Although the Board accepted Applicant's statement of the standard for determining abandonment, the Board failed to apply that standard to the facts of record.

**Statement of Facts**

On September 10, 2009, Applicant filed application Ser. No. 77/823,794 for the mark shown below ("Applicant's Mark"):



The application listed goods in International Classes 9, 18, 20, 22, and 25.

The application was approved for publication with no citation to any registration or application owned by Opposer or any other entity.

On July 8, 2010, Opposer filed its opposition, limited to the goods in International Class 25, a variety of clothing items and footwear.[1]

---

[1] The goods in Int'l Class 25 in the application are:  "Clothing, namely, pullovers, sweaters, sweatshirts, shirts, blouses, t-shirts, polo shirts, jackets, parkas, anoraks, coats, wind cheaters, vests, pants, shorts, underwear, ski wear, ski pants, ski suits, swimwear and beachwear, scarves, gloves, belts, waterproof and weatherproof clothing, namely, windproof and waterproof jackets, down vests, down jackets, weatherproof jackets, waterproof pants, fleece jackets, fleece shorts, fleece pullovers, ski pants, fleece pants, fleece sweaters, waterproof hats, fleece mittens, boots lined with wool, waterproof snow boots, waterproof hiking shoes, weatherproof hiking boots, weatherproof trekking boots and waterproof shoes; footwear, namely, boots, shoes, sandals, sport shoes, slippers; headgear, namely, hats, headbands and caps."  (Notice of Opposition, p. 1 (A119).)

The opposition was based solely on an alleged likelihood of confusion with the mark shown in Registration No. 1,856,808 issued to Opposer's predecessor-in-interest on October 4, 1994. The mark shown in Registration No. 1,856,808 ("Opposer's Mark") is:

**KELME** 🐾

The goods in Opposer's Registration No. 1,856,808 include a variety of clothing items and footwear.[2]

The notice of opposition is based solely on rights in the foregoing registered mark. The notice of opposition does not claim common law rights in the design portion of Opposer's Mark, and does not claim use of the design portion of the mark, separate and apart from the composite mark. The notice of opposition does not claim that the design component of Opposer's Mark is famous or even well-known.

Opposer's KELME brand is principally used on soccer shoes and soccer clothing. (Opposer's Final Brief, pp. 47-107 (A1475-1535).) There is no evidence in the record that Applicant sells soccer products under Applicant's Mark.

---

[2] The goods are "clothing; namely, track suits, trousers, shorts, vests, shirts, sweat shirts, stockings, socks, rainwear, waistcoats; footwear; namely, sport shoes, boots, and slippers; headgear; namely, caps and hats" in Class 25. (A78.)

On September 13, 2010, Applicant filed its Answer and Counterclaim. In its counterclaim, Applicant sought cancellation of Opposer's Registration No. 1,856,808 on the ground that Opposer had abandoned the mark shown in that registration, which was the sole basis of the notice of opposition. The evidence showed that Opposer has not used the mark shown in the Notice of Opposition in ten years. (Opinion, pp. 6-7, 9 (A6-7, 9).)

During the opposition, Applicant submitted evidence of at least 105 different third-party registrations, pending applications, and/or uses of marks consisting of or containing paw designs similar to those shown in Opposer's Mark and Applicant's Mark, used for footwear and related clothing items.  It is not surprising that there are so many other paw marks registered or in use, given that paws are highly suggestive of speed, agility, and power. Opposer did not object to this evidence. Opposer submitted *no* evidence that the design portion of its mark is famous or even well-known and *no* evidence that consumers identify the design of a paw with Opposer.  This, too, is not surprising, given the large number of similar third-party designs.

**The Board's Decision on the Opposition**

The Board held that there is a likelihood of confusion between the parties' marks. In analyzing the similarity of the marks, the Board said, "We base our determination on a consideration of the marks in their entireties." (A16.) It also

5

said, "It is clear that the KELME component of opposer's mark creates a visual and phonetic impression that is absent from applicant's mark." (A17.) However, nowhere did the Board compare Opposer's composite mark with Applicant's design mark. Rather, the Board dissected Opposer's Mark and compared only the design portion of Opposer's Mark with Applicant's design mark, saying that Applicant's Mark "resembles in many respects *the design component* of opposer's mark." (A18-19 (emphasis added).)  As a justification for ignoring the word KELME in Opposer's Mark, the Board said, "Companies that use marks consisting of a word plus a logo often display their logos alone, unaccompanied by the literal portions of their trademarks." (A19.) However, there is no evidence to support this assertion, and it obviously nullifies the "anti-dissection rule."

As for the numerous third-party paw designs that Applicant submitted in evidence, which showed that such marks are commonplace, the Board made a close comparison of those designs, pointing out that many are "quite different" from Opposer's Mark in that a number of them "have very prominent claws," whereas Opposer's paw design has no claws. (A21.) Significantly, Applicant's Mark has prominent claws, yet, in comparing Opposer's design with Applicant's design, the Board did not find that they are "quite different." Instead, it ignored the claws on Applicant's Mark, and found that the parties' paw designs are "substantially similar." (A26.)

Finally, the Board dismissed Applicant's counterclaim, holding that Opposer had not abandoned its mark. The Board held that a new version of Opposer's Mark, which replaced the registered version and which Opposer has been using for the past ten years in place of the registered version, did not constitute a "material alteration" of the registered mark. (A12.) However, Applicant showed that the change was sufficient to require republication of the mark and therefore constituted a material alteration.

## V.     SUMMARY OF ARGUMENT

The Board's decision should be reversed in its entirety because it is not supported by substantial evidence and is contrary to law. The Board's principal error consisted of dissecting Opposer's Mark and failing to compare Opposer's composite mark, as a whole, with Applicant's Mark. Further, the Board made an assumption – not supported by any evidence, much less substantial evidence – that companies use the design portion of their composite marks apart from the name brand portion of their marks. The Board also failed to consider the suggestive, commonplace nature of paw designs, and failed to acknowledge that there was *no* evidence that consumers associate a paw design with Opposer. Further, the Board failed to consider adequately the differences in the parties' goods and the manner in which they are purchased.  As to Applicant's counterclaim for cancellation of Opposer's Mark on the ground that Opposer abandoned it by replacing it with a

different mark ten years ago, the Board agreed with Applicant that the issue was whether Opposer's new mark constituted a "material alteration" of Opposer's Mark, but then failed to apply that standard to the evidence of record.

## VI.    ARGUMENT

A.    **The Standard of Review**

This Court reviews the Board's factual determinations under the "substantial evidence" standard set out in the Administrative Procedure Act.  The court must set aside the Board's factual determinations if they are "unsupported by substantial evidence."  5 U.S.C. § 706(2)(e).  "Considered to be less deferential than the [former] 'arbitrary, capricious' standard, *see In re Gartside*, 203 F.3d at 1312, 53 U.S.P.Q.2d at 1773, 'substantial evidence' necessitates a stricter judicial review of agency factfinding." *On-Line Careline*, *Inc. v. Am. Online*, *Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000); *See also Recot*, *Inc. v. Becton*, 214 F.3d 1322, 1327 (Fed. Cir. 2000).

This Court reviews questions of law *de novo* and without deference. *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265 (Fed. Cir. 2002). Although the Board's findings as to the individual elements of the *du Pont* likelihood of confusion test (*In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357 (C.C.P.A. 1973)), are considered factual findings and thus reviewed under the "substantial evidence" rule, the overall weighing of the individual elements of the

8

*du Pont* test is considered a question of law and is thus reviewed *de novo*, *Coach Services*, *Inc. v. Triumph Learning L.L.C.*, 668 F.3d 1356, 1371 (Fed. Cir. 2012), as is the ultimate issue of likelihood of confusion, *In re Viterra Inc.*, 671 F.3d 1358, 1361 (Fed. Cir. 2012).

B.    **The marks at issue must be compared in their entireties, and the Opposer's Mark may not be dissected.**

The U.S. Supreme Court has said, "The commercial impression of a trademark is derived from it as a whole, not from the elements separated and considered in detail. For this reason, it should be considered in its entirety . . . . " *Estate of P.D. Beckwith*, *Inc. v. Comm'r of Pat.*, 252 U.S. 538, 545-46 (1920). Further, '[c]onflicting marks consisting of both words and pictorial symbols must be compared in their *entireties* . . . ." 4. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (*hereinafter"McCarthy"*) § 23:47 at 23-247-248 (4th ed. 2014) (emphasis in original).

Here, the Board acknowledged that a comparison of the marks must be based "on a consideration of the marks in their entireties." (A16 (citing *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 U.S.P.Q. 749, 751 (Fed. Cir. 1985), and *Franklin Mint Corp. v. Master Mfg. Co.*, 667 F.2d 1005, 212 U.S.P.Q. 23, 234 (C.C.P.A. 1981)).)  However, the Board failed to compare the Opposer's Mark – in its entirety – with Applicant's Mark. Opposer's Mark in its entirety consists of the KELME brand and a design. Nowhere in the decision does the Board state that

Applicant's design mark is confusingly similar to Opposer's entire mark, consisting of the KELME brand and a design. The absence of any such statement is a tacit admission by the Board that the marks are not confusingly similar when considered "in their entireties." This tacit admission is not surprising, since the Board did not dispute that "KELME constitutes the dominant portion of the mark" and conceded that "[i]t is clear that the KELME component of opposer's mark creates a visual and phonetic impression that is absent from applicant's mark." (A17.)

The Board was essentially compelled to find that KELME is the dominant portion of the Opposer's Mark, because of this Court's recent decision in *In re Viterra Inc.*, 671 F.3d 1358, 1366 (Fed. Cir. 2012), re-affirming this Court's "decisions holding that the verbal portion of a word and design mark likely will be the dominant portion. *CBS Inc. v. Morrow*, 708 F.2d 1579, 1581-82 (Fed. Cir. 1983) ('[T]he verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed.')." 4 *McCarthy*, § 23:44 at 23-242 ("[I]f a buyer would be more likely to remember and use one part of a mark as indicating origin of the goods, then this is the dominant portion of the mark.") (footnote omitted)

This Court in *Viterra* went on to explain why the word portion of a composite mark is the dominant portion:

This makes sense given that the literal component of brand names likely will appear alone when used in text and will be spoken when requested by consumers. *See id*. at 1582 ("This is particularly true when a mark appears in textual material, such as catalog descriptions, in which it is often impossible or impractical to include the design feature of the mark" (footnote omitted)); *In re Dakin's Miniatures, Inc.*, 59 U.S.P.Q.2d 1593 (T.T.A.B. 1999) ("In the case of marks which consist of words and a design, the words are normally accorded greater weight because they would be used by purchasers to request the goods.")….

671 F.3d at 1366 (Citation omitted.)[3]

Consistent with this general rule, cases comparing a composite mark (consisting of a word and design) with a design mark have found the word portion to be the dominant portion and have found no likelihood of confusion.

In *Pameco-Aire, Inc. v. Lantz International Corporation*, 196 U.S.P.Q. 260 (T.T.A.B. 1977), applicant applied to register this composite mark:



The opposer based its opposition on this registered mark:

---

[3] In *Viterra*, the Court stated that the rule that the verbal portion of a composite mark is generally the dominant portion holds true even if, as in that case, a word portion of the composite mark has been disclaimed.  671 F.3d at 1366-67.  The Board's rationale in *Viterra* applies with even greater force here, since the word portion of Opposer's composite mark, rather than having been disclaimed, is its fanciful house mark – its brand.



The Board held that there was no likelihood of confusion:

> While the mark of the opposer consists only of the design of a globe in association with arrows the mark of the applicant has in addition to its globe/arrow design the word "LANTZ" which is set apart in large bold letters and stands out conspicuously as the dominant and most prominent feature of the mark that is the part which triggers the commercial impression engendered by the mark as a whole, *and therefore serves to enhance the recognizable differences between the design portions of the two marks*, and to greatly diminish the likelihood that purchasers would attribute the products sold thereunder to the same source….
>
> Accordingly, we conclude that when the respective marks of the parties are compared in their entireties, applicant's mark which consists of the dominant word "LANTZ" in addition to its globe/arrow design does not so resemble opposer's mark as to be likely when applied to the goods of the opposer to cause confusion, or to cause mistake or to deceive.

*Lantz*, 196 U.S.P.Q. at 263 (emphasis added; citations omitted).

As in *Lantz*, here the KELME brand "is set apart in large bold letters and stands out conspicuously as the dominant and most prominent feature of the mark" and is "the part which triggers the commercial impression engendered by the mark as a whole." Opposer's consumers obviously would ask for "KELME shoes" and not "paw print shoes." Further, KELME is even more prominent than LANTZ,

since KELME appears to the left of the design, and, reading from left to right, KELME would be the first part of Opposer's Mark that consumers would see. As in *Lantz*, the KELME brand therefore serves to enhance the recognizable differences between the design portions of the two marks.

Similarly, in *RA Brands*, *L.L.C. v. Pure Fishing*, *Inc.*, Opp. No. 91120088, 2002 WL 1022539 (T.T.A.B. May 15, 2002), the opposer's mark consisted of a design of a fish with an open mouth, and the applicant's mark was a composite of its BERKLEY house mark, the slogan CATCH MORE FISH, and a fish with an open mouth. The parties' goods were identical or closely related and their trade channels were the same, to the extent that the parties' products appeared next to each other in stores. The Board noted that the parties' products cost $5–$8 and were purchased without careful consideration. Yet the Board dismissed the opposition. It found the factor of the similarity of the marks to be "highly determinative in our analysis" and said:

> When we compare the marks in their entireties, we find the overall commercial impressions of applicant's and opposer's marks to be entirely different. Opposer's mark consists solely of a stylized fish, together with a stylized fishing line. Applicant's mark is a composite mark featuring not only the house mark BERKLEY, but also the slogan, CATCH MORE FISH. The fish design element of applicant's mark is of minimal significance in the overall impression. Moreover, the fish design itself is clearly not a replica or imitation of opposer's particular design.

*RA Brands*, 2002 WL 1022539, at *4.

Here, too, when the marks are compared "in their entireties," the "the overall commercial impressions" of the parties' marks are "entirely different." The Board in effect conceded this, and therefore the decision below should be reversed.

C.     **The Board improperly dissected Opposer's Mark**

Consistent with the rule that marks must be compared in their entireties, marks may not be dissected into their component parts. The anti-dissection rule is a basic rule in this Court and other circuits. *China Healthways Inst.*, *Inc. v. Wang*, 491 F.3d 1337, 1340 (Fed. Cir. 2007) ("It is incorrect to compare marks by eliminating portions thereof and then simply comparing the residue"); *Recot*, 214 F.3d at 1330 (Fed. Cir. 2000) (reversing Board because "it improperly dissected the marks"); *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985) ("[L]ikelihood of confusion cannot be predicated on dissection of a mark."); 4 *McCarthy* § 23:41 at 23-227 ("A mark should not be dissected or split up into its component parts and each part then compared with corresponding parts of the conflicting mark to determine the likelihood of confusion"); *see also Official Airline Guides*, *Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) ("[U]nder the anti-dissection rule, the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace.").

The rule is of course applicable in TTAB cases. In *Red Bull GmbH v. American Baseball Co.*, Opp. Nos. 91150958 & 91150961 (T.T.A.B. May 21, 2004), the Board found no likelihood of confusion between RED BULL for baseballs and BULL NECK for baseball gloves. The Board said then, "Opposer's contention that the marks are similar because they both include the word BULL rests on an improper dissection of the marks." (P. 13.) The Board noted that although the two marks had a common element (BULL), that element appeared at the beginning of one party's mark and the end of the other's.  (Slip Op. at 12.)  The Board concluded: "The marks present distinctly different and dissimilar commercial impressions when they are viewed in their entireties, such that purchasers are not likely to be confused as to the source or sponsorship of the parties' respective goods. The relatedness of the goods simply is outweighed by the overall dissimilarity of the marks." (Pp. 18-19.)

Here, the Board violated the anti-dissection rule by comparing the design portion of Opposer's Mark with Applicant's Mark, and ignoring the KELME portion of Opposer's Mark, even though KELME is the dominant portion of Opposer's Mark. Although the Board pays lip service to the principle that marks must be compared in their entireties (A16, 19), a reader will search the Board's decision in vain for any such comparison. The Board simply makes *no* conclusion as to any similarity between Opposer's Mark *in its entirety* and Applicant's Mark.

15

The comparison discussed at pages 17-19 of the Board's decision (A17-19) is a comparison of the design portion of Opposer's Mark and Applicant's Mark, and the Board's conclusion is only that Applicant's Mark "resembles in many respects *the design component* of opposer's mark." (A19 (emphasis added).)

D.    **There is no evidence in the record to support the Board's rationale for dissecting Opposer's Mark.**

Recognizing that the marks were required to be compared in their entireties and that the dominant portion of Opposer's Mark is simply absent from the Applicant's Mark, the Board offered the following rationale for comparing only the design portion of Opposer's Mark with Applicant's Mark.

> Companies that use marks consisting of a word plus a logo often display their logos alone, unaccompanied by the literal portions of their trademarks. Indeed, opposer has demonstrated that it sometimes displays its paw design (in its modified form) separate and apart from the KELME designation. Applicant's mark could therefore be interpreted by customers as a display of opposer's design, apart from opposer's word element. *See In re United States Shoe Corp.*, 229 U.S.P.Q. 707, 709 (T.T.A.B. 1985) ("Applicant's mark would appear to prospective purchasers to be a shortened form of registrant's mark.")

(A19-20 (footnote omitted).)

The foregoing rationale is legally and factually erroneous, and constitutes reversible error for at least four independent reasons. *First*, there is no evidence in the record, let alone substantial evidence, that "[c]ompanies that use marks consisting of a word plus a logo often display their logos alone, unaccompanied by

the literal portions of their trademarks." The Board cited no evidence to support this sweeping proposition, and Opposer cited no such evidence. Accordingly, the decision below must be reversed, under *On-Line Careline*, because it is not based on substantial evidence.

*Second*, there is no evidence in the record, let alone substantial evidence, that (a) consumers believe that entities that use marks consisting of a word plus a design often use the design by itself or (b) consumers associate a paw design – a commonplace design in the clothing and footwear field – with Opposer. Therefore, there was no evidence, let alone substantial evidence, that consumers would "interpret" Applicant's Mark "as a display of Opposer's design." Not only did the Board fail to cite any evidence to support this point, and not only did Opposer fail to submit any evidence on this point, but also Opposer did not claim in its notice of opposition any common law rights in a paw mark *per se*. (*See* Notice of Opposition (A119-122), basing opposition solely on registered composite mark, consisting of KELME and design.) In short, there was simply *no evidence* that the paw design portion of Opposer's Mark had achieved recognition among consumers independent of the KELME element. The Board found that Opposer's sales information was "very limited" and "shows opposer's sales to be very modest." (A25.) Moreover, Opposer's witness testified that consumers request its products by using the name KELME and he could not say that consumers request Opposer's

products by referring to the paw design instead of the word KELME.  (January 11,

2013 deposition of Duarte Da Silveira (hereinafter "Da Silveira Dep."), pp. 48-49

(A333-334).)  Accordingly, the evidence showed that the design portion of

Opposer's Mark had *not* achieved recognition among consumers independently of

the word portion.[4]

In *DuoProSS Meditech Corp. v. Inviro Medical Devices*, *Ltd.*, 695 F.3d 1247

(Fed. Cir. 2012), the Board had said that a mark incorporating a broken

exclamation point requires consumers to employ imagination, thought, and

perception to determine the nature of the goods with which the mark was used.

This Court criticized this finding as follows:

> The Board, however, cited no evidence in the record supporting the
> conclusion that a consumer would have to employ imagination,
> thought, and perception to determine that the mark was referring to
> the snapping of a syringe plunger. The commercial impression that a
> mark conveys must be viewed through the eyes of a consumer.  *In re
> Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 1345 (Fed. Cir.
> 2001) (noting that competent evidence is necessary to demonstrate
> "the relevant purchasing public's understanding of a contested term").
> The Board, however, failed to cite any evidence indicating how
> a consumer would perceive a mark incorporating the exclamation
> point. In the absence of any such evidence in the record,
> the Board effectively imposed its own view about the commercial
> impression of the mark rather than that of the relevant consumer.

---

[4] And Opposer admitted that it had no documents showing that consumers believe
goods sold under any third-party paw marks emanate from Opposer. *See*
Opposer's Response to Applicant's First Requests for Production of Documents
No. 8, in Applicant's Notice of Reliance on Opposer's Discovery Responses, page
25 (A634).

*DuoProSS*, 695 F.3d at 1253-1254.  Similarly, in *University of South Carolina v. University of Southern California*, 367 F. App'x 129 (Fed. Cir. 2010), the Board made certain conclusions about the care that consumers would exercise, and this Court held that the Board had assumed facts about consumer beliefs that were not supported by substantial evidence.  The Court admonished the Board that "[s]peculation does not constitute substantial evidence."  *Id.* at 134.

*Third*, the Board was factually wrong in saying that "opposer has demonstrated that it sometimes displays its paw design (in its modified form) separate and apart from the KELME designation." In a footnote, the Board purported to supply factual support for this statement by referencing "Da Silveira Exhibit 3 (top of shoe box); Exhibit 7 (cover of 2007 'soccer' catalogue); Exhibit 8 (cover of 2007 'indoor' catalogue)."  (A19 n.35.)

In fact, Opposer does not "display[] its paw design (in its modified form) separate and apart from the KELME designation."  As to the first of the three exhibits, Exhibit 3 (A439-443), Mr. Da Silveira testified that it consisted of copies of the top and the four sides of one of Opposer's shoeboxes.  (A309-310.)  The Board was apparently referring to the first page of Exhibit 3, which shows the top of the shoebox, which displays the design portion of Opposer's revised mark, and does not display the word KELME.  However, as the second, third, fourth, and fifth pages of Exhibit 3 show, the full mark, with both the word KELME and the design,

19

appears on *all four sides* of the shoebox.  And, as shown on the third and fifth pages, on two of the sides of the box, the full composite mark is the only thing displayed.  As Mr. Da Silveira testified about the fifth page of Exhibit 3, it "highlight[s] the Kelme trademark and company logo in [sic] the box."  (A310.) Thus, Exhibit 3 is not an instance of Opposer's "display[ing] its paw design (in its modified form) separate and apart from the KELME designation."

As to the second of the three exhibits cited by the Board, Exhibit 7 (A460-493), the Board was referring to the first page of that exhibit, which shows the cover of one of Opposer's catalogs.  But that cover displays the design portion of Opposer's revised mark and the word KELME.  As to the third of the three exhibits referred to by the Board, Exhibit 8 (A494-501), the Board was again referring to the first page of that exhibit, which shows the cover of another of Opposer's catalogs.  Again, however, that cover displays the design portion of Opposer's revised mark *and* the word KELME.  Thus, none of the three exhibits the Board relied on shows that Opposer "displays its paw design . . . separate and apart from the KELME designation."

Moreover, the Board did not even claim that any of the three exhibits was an instance of Opposer's displaying the paw design portion of its Mark *as registered and pleaded in the notice of opposition* "separate and apart from the KELME

designation." Rather, the paw design shown in these exhibits was, as the Board acknowledged, a "modified form" of the paw design.

*Fourth*, the Board's rationale is legally erroneous. The one case the Board cited, *In re United States Shoe Corp.*, 229 U.S.P.Q. 707, 709 (T.T.A.B. 1985), does not support the proposition that Applicant's Mark could be "interpreted by customers as a display of opposer's design, apart from opposer's word element." In *United States Shoe*, the applicant applied to register two marks consisting of the words CAREER IMAGE. The examining attorney refused registration based on a prior registration for CREST CAREER IMAGES. The Board upheld the refusal based on likelihood of confusion.  The decision does not involve a composite mark consisting of a brand and a logo, and does not stand for the proposition for which it is cited, namely, that "Applicant's mark could  . . . be interpreted by customers as a display of opposer's design, apart from opposer's word element."

In sum, the Board's notion that "[c]ompanies that use marks consisting of a word plus a logo often display their logos alone, unaccompanied by the literal portions of their trademarks," is factually and legally without support. Moreover, it would be applicable to all composite marks and, if accepted by this Court, would mean that all composite marks could be dissected. The Board's notion would nullify established precedent, including this Court's holdings, that marks must be compared in their entireties and that marks may not be dissected.

With no legal or evidentiary support, the Board's conclusion must be reversed.

E.    **The design portion of Opposer's Mark is weak, based on extensive third-party use and registration.**

Applicant submitted evidence of 94 clothing marks consisting of or containing paws that have been registered or are the subject of pending applications, almost all of which Opposer could have opposed but did not.[5]  And Applicant submitted Internet evidence that 17 of the third-party clothing marks consisting of or containing paws that are on the register,[6] as well as 15 other such clothing marks that have never been applied for, are in use in the U.S.  (Opposer's

---

[5] Since May 17, 1993, when Opposer filed the application that matured into its Reg. No. 1,856,808, there have been at least 19 third-party applications in Class 25 that consist solely of a paw or paws that have matured to registration (Applicant's Notice of Reliance on Official Records, Exhibits EE, FF, GG, II, QQ, RR, SS, TT, VV, WW, XX, YY, AAA, DDD, EEE, FFF, UUU, LLLL, and LLLLL (A656-661, 664-665, 680-688, 691-699, 703-704, 709-714, 748-749, 784-786, 839-842)) and 71 third-party applications in Class 25 that consist of a paw or paws and words or other items that have matured to registration (Applicant's Notice of Reliance on Official Records, Exhibits HH, JJ, KK, LL, MM, NN, OO, PP, UU, ZZ, BBB, CCC, GGG, HHH, III, JJJ, KKK, LLL, MMM, NNN, OOO, PPP, QQQ, RRR, SSS, TTT, VVV, XXX, YYY, ZZZ, AAAA, BBBB, CCCC, DDDD, EEEE, FFFF, GGGG, HHHH, IIII, JJJJ, KKKK, MMMM, NNNN, OOOO, PPPP, QQQQ, RRRR, SSSS, TTTT, UUUU, VVVV, WWWW, XXXX, YYYY, ZZZZ, AAAAA, BBBBB, CCCCC, DDDDD, EEEEE, FFFFF, GGGGG, HHHHH, IIIII, JJJJJ, KKKKK, MMMMM, NNNNN, OOOOO, QQQQQ, and RRRRR (A662-663, 666-679, 689-690, 700-702, 705-708, 715-747, 750-751, 754-783, 787-838, 843-853, 858-864)).

[6] Applicant's Notice of Reliance on Official Records, Exhibits CC, DD, EE, GG, NN, QQ, SS, UU, BBB, DDD, GGG, III, JJJ, YYY, IIII, JJJJ, and TTTT (A651-657, 660-661, 674-675, 680-681, 684-686, 689-690, 705-706, 709-710, 715-716, 720-725, 757-759, 778-781, 802-803).

Notice of Reliance on Internet Documents, Exhibits A-BB (A871-1298).)  Thus, there was considerable evidence before the Board that consumers are aware that a paw used as a mark or in a composite mark is not sufficient to allow them to determine the origin of the product sold under that mark.  On the contrary, consumers realize that, to determine the origin of such products, they must look to the brand name under which the product is sold.

As the Board said in *In re Broadway Chicken, Inc.*, 38 U.S.P.Q.2d 1559, 1565-66 (T.T.A.B. 1996), "Evidence of widespread third-party use, in a particular field, of marks containing a certain shared term is competent to suggest that purchasers have been conditioned to look to the other elements of the marks as a means of distinguishing the source of goods or services in the field."  (Citations omitted.)  This widespread use of paws in marks in Class 25 in the U.S. thus substantially weakens the design element of Opposer's Mark and is yet another reason why there is no likelihood of confusion between Opposer's composite mark and Applicant's design-only mark.

The Board has held that a mark in a crowded field of marks is entitled to only a narrow zone of protection, and that distinctions in the details of the marks are sufficient to make the junior mark registrable.  For instance, in *In re Lucky Co.*, 209 U.S.P.Q. 422 (T.T.A.B. 1980), both parties' marks consisted of three stripes on athletic shoes.  But because of the common use of three stripes on athletic shoes,

the fact that the applicant's three stripes included a curve and the cited registrant's did not was sufficient to make applicant's mark fall outside the registrant's zone of protection.  The Board held that this third-party use results in "marks that are extremely weak and certainly entitled to only a very narrow and limited scope of protection . . . . This means that competitors in this field may come closer to such weak marks without violating the owner's rights therein than would be the case with a stronger mark."  *In re Lucky*, 209 U.S.P.Q. at 423 (citations omitted).

Here, even though the Board conceded that some of the third party designs "quite closely resemble opposer's design" (A21), the Board discounted much of Applicant's evidence of third party use on the ground that these paw marks "are displayed on apparel primarily in an ornamental fashion" (A22).  The Board felt "it is clear that these marks are displayed for the purpose of showing an association with particular colleges, high schools, and their sports teams, rather than to identify an apparel or a sporting goods company." (*Id*.) The Board cited no relevant case for the proposition that such use can be discounted. The one case it cited, *In re Paramount Pictures Corp.*, 213 U.S.P.Q. 1111, 1112 (T.T.A.B. 1982), involved a design on a t-shirt that was obviously ornamental, for it promoted the TV show "Mork & Mindy."  The decision says nothing about the propensity of third-party secondary source marks to weaken an opposer's mark in consumers' minds.

24

Further, there is no evidence in the record, let alone substantial evidence, as to the purpose for which these third-party paw marks are displayed, or as to how consumers perceive them. Significantly, at least one federal court has explicitly held that there is no difference between third-party primary source marks and allegedly "ornamental" marks; in both cases they weaken the alleged mark. In *Moose Creek*, *Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214 (C.D. Cal. 2004), *aff'd*, 114 F. App'x 921 (9th Cir. 2004), the defendant – like Applicant here – "proffered substantial evidence, in the form of internet advertisements, that demonstrates that many retailers are selling clothing bearing either the word 'moose' or a picture of a moose very similar in appearance to the moose depicted in Plaintiffs' marks." *Id.* at 1224. The court concluded:

> *Regardless of whether the owners of these clothing companies affix a moose to their clothing line as a trademark or as an ornamental design*, the point is that members of the public (who would include Plaintiffs' customers) have likely seen a picture of a realistic-looking moose on many different brands of clothing, and thus are not likely to associate [one of defendant's products] containing a picture of a moose exclusively with Plaintiffs' Moose Creek clothing brand.

*Moose Creek*, 331 F. Supp. at 1225 (emphasis added). Applicant discussed this case at length in its brief for the Board below (A1560), but the Board completely ignored the case in its opinion.

As in *Moose Creek*, here consumers are accustomed to seeing paw designs on a wide variety of clothing products. Therefore, they would not think a paw on

Opposer's products indicates any particular source, and might reasonably think it is just ornamentation. Rather, given that a paw is suggestive of an agile, fast, and powerful animal, they would not be surprised to see it in on many different clothing and footwear products. Thus, not only has Opposer not claimed any rights in a paw mark *per se*, but also paw marks are extremely weak. There is simply no evidence for concluding that a consumer seeing Applicant's Mark would associate it with Opposer.

With this in mind, we review the evidence of third-party use of paw designs. In the PTO database, there are at least 21 third-party marks in Class 25 that consist solely of a paw or paws,[7] and at least 73 third-party marks in Class 25 that consist of a paw or paws and words or other items, for a total of 94 marks shown in registrations or pending applications![8] On the Internet, there are at least 28 third-

---

[7] Applicant's Notice of Reliance on Official Records, Exhibits CC, DD, EE, FF, GG, II, QQ, RR, SS, TT, VV, WW, XX, YY, AAA, DDD, EEE, FFF, UUU, LLLL, and LLLLL (A651-661, 664-665, 680-688, 691-699, 703-704, 709-714, 748-749, 784-786, 839-842).

[8] Applicant's Notice of Reliance on Official Records, Exhibits HH, JJ, KK, LL, MM, NN, OO, PP, UU, ZZ, BBB, CCC, GGG, HHH, III, JJJ, KKK, LLL, MMM, NNN, OOO, PPP, QQQ, RRR, SSS, TTT, VVV, WWW, XXX, YYY, ZZZ, AAAA, BBBB, CCCC, DDDD, EEEE, FFFF, GGGG, HHHH, IIII, JJJJ, KKKK, MMMM, NNNN, OOOO, PPPP, QQQQ, RRRR, SSSS, TTTT, UUUU, VVVV, WWWW, XXXX, YYYY, ZZZZ, AAAAA, BBBBB, CCCCC, DDDDD, EEEEE, FFFFF, GGGGG, HHHHH, IIIII, JJJJJ, KKKKK, MMMMM, NNNNN, OOOOO, PPPPP, QQQQQ, and RRRRR (A662-663, 666-679, 689-690, 700-702, 705-708, 715-747, 750-783, 787-838, 843-864).

party paw marks in use in the U.S. for clothing. (Applicant's Notice of Reliance on Internet Documents, Exhibits A-BB (A871-1298).) For example:

                

Clemson U.        Bates College        Ohio U.        Princeton High School    Eastern Illinois University

In fact, the use of paw marks is so common in the U.S. that Opposer's own witness, when asked whether he was aware of other high schools (besides two near his residence in Naples, Florida) that use a paw on merchandise, stated that there were others, "because it's a normal use format." (Da Silveira dep., p. 57 (A342).)[9]

The Board discounted some of this evidence because, it said, the paw designs "are displayed together with other distinguishing matter, such as college names or acronyms, monograms, and distinctive graphic details." (A23.) The Board's decision in this regard is completely inconsistent with its decision not to consider that Opposer's paw is displayed with the KELME brand, which clearly is

---

[9] Opposer's witness gave additional testimony showing the common use of paw marks in the U.S. He testified that the following universities in the U.S. sell clothing with paw logos on them: Clemson University, DePauw University, North Carolina State University, and the University of California. He also testified that the following high schools in the area of Naples, Florida, where he lives, sell clothing with paw logos on them: Palmetto Ridge High School and Barron Collier High School. He further testified that there are other paw logos used for clothing in the U.S., both with and without claws. (A334-341.)

"distinguishing matter." If consumers use college names to distinguish one paw from another, they will also use a distinctive brand like KELME to distinguish one paw from another.

Further, the Board discounted some of the third party evidence because on close inspection the Board was able to identify differences between some of the third party paws and Opposer's paw. For example, it noted that some of them had five digits rather than four. (A21-23.) But, again, there is no evidence to suggest that consumers looking at the Opposer's Mark, Applicant's Mark, or one of the third-party marks can recall which has four digits and which has five. There is therefore no evidentiary basis for the Board's apparent view that paw designs with five digits have no dilutive effect on Opposer's paw design.

The Board's close inspection of the third-party marks is also completely inconsistent with the manner in which it compared Opposer's paw and Applicant's paw: after noting numerous differences between the parties' paws, the Board simply discounted those differences, concluding that "[d]espite the differences . . . the two designs have substantial visual similarities." In other words, the Board apparently believes that consumers will somehow make a close inspection of Opposer's paw and be able to distinguish it from the dozens of third party paws, but they will not make a close inspection of Applicant's paw and will be confused by it, even though Opposer's products say KELME and Applicant's do not.

Thus, the Board simply had no basis—in the evidence or in case law – to conclude that the numerous third-party "secondary source" marks are unlikely to weaken Opposer's already weak paw design. Where, as here, there is no evidentiary basis for the Board's factual conclusion on one of the *du Pont* factors, this Court must set aside that conclusion under the substantial evidence standard. See discussion of *DuoProSS* and *University of South Carolina v. University of Southern California* at pages 16-17, *supra*.

That third-party dilution will cause consumers to look beyond the mere presence of paws to determine origin is particularly significant in this case. Here, Opposer's Mark includes Opposer's brand name KELME just to the left of (and thus, for U.S. readers, before) the paw. The inclusion of Opposer's dominant KELME mark in the composite mark it relies on in this proceeding essentially ensures that consumers will not be confused.

F. **The paw design that Opposer uses with its KELME brand is materially different from the Applicant's Mark.**

The Board did not simply fail to offer support for its conclusion that consumers would be likely to confuse a composite mark whose dominant portion is KELME with a design mark from which that dominant portion is missing. In addition, the Board simply ignored all the differences between the paw design that is part of Opposer's Mark and the paw design that constitutes Applicant's Mark—

differences that, in addition to the use of the KELME brand, show that confusion between the Applicant's Mark and Opposer's Mark is unlikely.

The most obvious difference between the two paw designs is that Applicant's paw appears to be that of an animal that could be dangerous to human beings, because of the presence of the claws at the ends of the toes of the paw. By contrast, the paw that is part of Opposer's Mark lacks claws and appears to be soft and domestic – cuddly rather than dangerous. The two paw designs thus convey materially different commercial impressions. And that's without taking the word KELME into account, which the Board was required to consider (pp. 24-25f, above).

In addition, the two paw designs differ in the following respects:

1.     a. The design in Opposer's Mark looks like something drawn by a child.

b. The design that is Applicant's Mark looks like something drawn by an adult.

2.     a. The tops of the four ovals that constitute the toes of the paw are equidistant from the center of the rounded triangle in the design in Opposer's Mark. The bottoms of the four ovals are also equidistant from the center of the rounded triangle. Thus, if the rounded triangle

is interpreted as a palm, the overall impression is that the four toes are equidistant from the center of the palm.

b. The tops of the two outside toes and the bottoms of the two middle toes in the paw that is Applicant's Mark are equidistant from the center of the palm in that paw.  Thus, the overall impression is that the two middle toes in Applicant's Mark are about a toe's length farther from the middle of the palm than the two outside toes are.

3.    a. The palm of the paw of Applicant's Mark has at least six indentations in its edge in order to give it the overall impression of a realistic palm.

b. The palm of the paw in Opposer's Mark has no indentations and is merely a rounded triangle, so its overall impression is schematic rather than realistic.

4.    a. In Applicant's Mark, the palm is obviously not symmetrical with respect to a line drawn through the middle two toes of the paw and continuing through the palm.  This also gives this paw design a realistic impression.

b. In the paw design in Opposer's Mark, the palm is roughly symmetrical with respect to a line drawn through the middle two toes

of the paw and continuing through the palm.  This gives this paw

design an unrealistic impression.

Thus, the two marks convey distinctly different commercial impressions.[10]

Although the Board acknowledged these differences, it simply discounted them,

saying that "the two designs have substantial visual similarities" (A18), and that

both "would be interpreted as a paw or paw print" (A19).  As noted above, this is

inconsistent with the close inspection the Board used to distinguish the third-party

marks.

G.    **Because of the differences between the parties' marks, this Court should weigh the *du Pont* factors *de novo* and find that confusion between the marks is not likely.**

As noted above, this Court reviews the weighing of the *du Pont* factors *de*

*novo*.  And where, as here, the parties' marks are clearly distinguishable, that is

sufficient for a finding that confusion is not likely, regardless of the other *du Pont*

factors.  Yet this Court and the Board have repeatedly dismissed oppositions where,

as here, the marks on their face are dissimilar *even though* (1) the opposer's mark

was found (or assumed) to be famous (here, the Board found it is not famous

(A25)), (2) the goods and trade channels of the parties were found (or assumed) to

be similar, and (3) the conditions of purchase were found (or assumed) to be such

---

[10] These different commercial impressions also make it particularly unlikely that Applicant's Mark could, in the Board's words, "be interpreted by customers as a display of opposer's design, apart from opposer's word element."  (A19-20.)

that consumers would not be particularly careful.  For example, in *Champagne Louis Roederer, S.A. v. Delicato Vineyards*, 148 F.3d 1373 (Fed. Cir. 1998), the Court affirmed the Board's dismissal of an opposition on the grounds that CRISTAL and CRISTAL CHAMPAGNE were simply too dissimilar to CRYSTAL CREEK to create a likelihood of confusion, even though all of the other *du Pont* factors favored opposer.  The Court stated: "We note … that we have previously upheld Board determinations that one *DuPont* factor may be dispositive in a likelihood of confusion analysis, especially when that single factor is the dissimilarity of the marks."  *Champagne Louis Roederer*, 148 F.3d at 1375.

In so holding, the court relied on *Kellogg Co. v. Pack'em Enterprises Inc.*, 21 U.S.P.Q.2d 1142 (Fed. Cir. 1991), in which the Court affirmed the Board's grant of summary judgment finding no likelihood of confusion between FROOTEE ICE and Design and FROOT LOOPS, both for food products, notwithstanding the Board's assumption that all the other *du Pont* factors (including the fame of the opposer's mark and the casual conditions surrounding the purchase of both parties' goods) favored a finding of likelihood of confusion.  In affirming the Board's ruling, the Court held that the dissimilarity of the marks "simply outweigh[ed]" the other factors, and that because of the dissimilarity, the opposer could not establish a likelihood of confusion.  The same result must obtain here, where – when the marks are considered in their entireties – the points of similarity are at least as

limited as the points of similarity in *Kellogg*, and Opposer's Mark is (unlike Kellogg's mark) not at all well-known.

In addition, consumers would be more careful in their purchasing decisions in this case than they would be when buying the inexpensive foods involved in the *Kellogg* case. Here, the goods covered in Opposer's registration and the subject application are mostly articles of clothing that constitute important purchases, not merely because they often cost more than the food products involved in the *Kellogg* case, but also because they are the types of goods that consumers do not soon replace by purchasing similar items. And they are the types of products that consumers know they will have to take the time to return if they do not fit. Thus, consumers are likely to take some time between when they first see the products and when they actually buy them, in order to make sure they do fit, lest they be forced to spend a much greater amount of time travelling back and forth to the store for the purpose of returning them. These simply are not casual, impulse purchases. *See*, *e.g.*, *Magnaflux Corp. v. Sonoflux Corp.*, 231 F.2d 669, 671 (C.C.P.A. 1956).

The *Kellogg* and *Roederer* cases are not alone in holding that even where all of the other *du Pont* factors favor a finding of a likelihood of confusion, the dissimilarity of the marks by itself can establish that there is no likelihood of confusion. For instance, in *Odom's Tennessee Pride Sausage*, *Inc. v. FF*

*Acquisition*, *L.L.C.*, 600 F.3d 1343, 1347 (Fed. Cir. 2010), the Court said: "[E]ven if all other relevant *DuPont* factors were considered in [the opposer's] favor…the dissimilarity of the marks was a sufficient basis to conclude that no confusion was likely" (finding no likelihood of confusion between designs of farmer boys for grocery store items).  *Accord*, *Keebler Co. v. Murray Bakery Prods.*, 866 F.2d 1386, 1390 (Fed. Cir. 1989) (summary judgment for applicant affirmed; PECAN SANDIES and PECAN SHORTEES for cookies not confusingly similar, because of "dissimilarity in commercial impression"); *Truescents L.L.C. v. Ride Skin Care L.L.C.*, 81 U.S.P.Q.2d 1334, 1342 (T.T.A.B. 2006); *Sears Mortg. Corp. v. Ne. Savings F.A.*, 24 U.S.P.Q.2d 1227, 1228 (T.T.A.B. 1992); *Missiontrek Ltd. v. Onfolio*, *Inc.*, 80 U.S.P.Q.2d 1381, 1383 (T.T.A.B. 2005); *Big O Tires*, *Inc. v. 67 & Latham*, *L.L.C.*, Opp. Nos. 91178685 & 91178688 (T.T.A.B. Nov. 18, 2008).

As stated above, this court reviews the overall decision of the Board in weighing the *du Pont* factors to determine the likelihood of confusion issue on a *de novo* basis.  Given the Board's tacit admission that, because of the presence of the KELME brand, the marks, when compared in their entireties, are not confusingly similar, this Court should reverse.  The substantial third party use, the lack of any evidence that Opposer has any common law rights in the paw *per se*, and the finding that Opposer's Mark is not well-known (A24-25) all weigh in Applicant's favor and compel reversal. In short, Opposer has not shown that confusion is likely.

## VII.  THE BOARD'S DECISION ON THE COUNTERCLAIM SHOULD ALSO BE REVERSED.

The decision below was fundamentally unfair for another reason: Opposer admitted that it has not used the mark it relies on in ten years. Therefore, its Registration should be cancelled. To the extent the Board considered Opposer's new version of its paw design, the Board's decision was inconsistent: it held that minor differences between Opposer's Mark and third-party marks were important, but it dismissed the differences between Opposer's abandoned mark and its new mark as "immaterial."

**Background**

In its counterclaim, Applicant sought cancellation of Opposer's Reg. No. 1,856,808 for Opposer's Mark, shown again below



The basis for the counterclaim is that Opposer had abandoned Opposer's Mark by ceasing all use of Opposer's Mark in 2004 and replacing it with its Replacement Mark, shown below:



Opposer admitted that it ceased using Opposer's Mark and replaced it in 2004 with

the Replacement Mark, and that it had actually filed a specimen showing its

Replacement Mark when it filed its Combined Declaration of Use and Application

for Renewal of Trademark Registration Under Sections 8 and 9 ("Combined

Declaration") on October 14, 2004.  (Opinion, pp. 6-7, 9 (A6-7, 9).)

The Board agreed with Applicant that whether Opposer's replacement of

Opposer's Mark with the Replacement Mark constituted abandonment of

Opposer's Mark was to be determined based on whether the Replacement Mark

constituted a "material alteration" of Opposer's Mark.  (A7.)

A.    **The Standard of Review**

This Court has ruled that whether a new mark constitutes a "material

alteration" of an old mark is a question of law that the Court reviews *de novo*.  *See*

*In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 1347 (Fed. Cir. 2001)

("Whether marks are legal equivalents is a question of law subject to our *de*

*novo* review.").

In this case, the Board accepted that, as Applicant pointed out in its brief (A1571), the test of materiality is set forth in Trademark Manual of Examining Procedure (TMEP), § 1609.02(a).  (A8, 11.)  That section states:

> "The general test of whether an alteration is material is whether, if the mark in an application for registration had been published, the change would require republication in order to present the mark fairly for purposes of opposition.  If republication would be required, the amendment is a material alteration."

Section 1609.2 adds that, "[I]f a design is integrated into a mark and is a distinctive feature necessary for recognition of the mark, then a change in the design would materially alter the mark."  Since the Board's finding of a likelihood of confusion here was based solely on the paw design in Opposer's Mark, that paw design must be considered "a distinctive feature necessary for recognition of the mark."

*Ex parte Kadane-Brown*, *Inc.*, 79 U.S.P.Q. 307, 308 (Comm'r Pat. 1948) (refusal of proposed amendment upheld), explains the reason for the republication rule, as follows:

> It is quite possible that persons dealing in similar goods and who had no objection to the composite mark as originally presented *might* have felt, or may now feel themselves damaged if any of the prominent features which formed a part thereof were not present.  If the proposed amendment were to be allowed, they would now be

confronted with a registration which they have no opportunity to oppose.[11]

(Emphasis added.)[12]

B.    **The Replacement Mark constitutes a material alteration of Opposer'**
      **Mark, so the Mark has been abandoned and the Registration must be**
      **cancelled.**

This case presents exactly the type of situation referred to in *Kadane-*

*Brown*.  The differences between Opposer's Mark and the Replacement Mark are

such that it is quite possible that parties who did not oppose the application that

matured into Reg. No. 1,856,808 would have wanted to oppose the Replacement

Mark.  As noted on page 33, *supra*, there are no nails or claws in Opposer's Mark.

However, the Replacement Mark clearly adds four small shapes that appear to

represent nails or claws.  Parties that, as of October 14, 2004 (when Opposer filed

its Combined Declaration), owned registrations or applications for marks in Class

25 that included paws with nails or claws might have had a reason to oppose an

application for the Replacement Mark at that time.

This Court, in its *de novo* review of the materiality issue, should reverse the

Board's finding on materiality – and thus the Board's ruling on Applicant's

---

[11] Applicant quoted this explanation in its trial brief.  (A1571-1572.)

[12] The Board also agreed with Applicant that the PTO's 2004 acceptance of the specimen showing the Replacement Mark (included with Opposer's Combined Declaration for Opposer's Mark) was irrelevant in this *inter partes* proceeding, since Applicant had no opportunity to object to that specimen when Opposer submitted it.  (A11.)

counterclaim.   There were two marks in Class 25 that consisted only of depictions of paws with nails or claws in the PTO's records on October 14, 2004, shown in Applicant's Notice of Reliance on Official Records (A656-657, 664-665).  Those two marks are set out below, respectively:

     

The Board did not consider the question of whether the owners of these two marks might have wanted to oppose the Replacement Mark even if they had not wanted to oppose Opposer's Mark.  And since the paw design shown in the Replacement Mark – unlike the paw design shown in Opposer's Mark – contained claws at the ends of the toes,  the owners of these marks *might* have wanted to oppose the Replacement Mark.  *See Kadane-Brown*, 79 U.S.P.Q. at 308.  As this Court has warned: "'What may seem minor to the trademark owner modifying his mark may, from the standpoint of maintaining continuous priority rights, result in an entirely new mark with its own, and later, priority.'"  *Van Dyne-Crotty*, *Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991) (quoting 1 J. Gilson, *Trademark Protection and Practice* § 3.03[1] at 3-67-68 (1990)).

For the above reasons, under the applicable standard, the Replacement Mark constitutes a material alteration of Opposer's Mark.  Yet, instead of actually considering the record in the context of the applicable standard, the Board simply dismissed the issue of whether third parties would have wanted the opportunity to oppose the Replacement Mark: "The publication of the original mark would have put interested persons on notice that the mark included a representation of an animal's paw. The changes in the modified version of the mark are typical of the variations to be reasonably expected in representations of animals' paws."  (A11 (footnote omitted).)  This, of course, is completely inconsistent with the Board's treatment of third party marks submitted by Applicant: in reviewing those marks, the Board found them "quite different," based on such details as whether they have four or five digits, and how prominent the Board believed their claws to be. (Opinion at 21, A21.)[13]

The Board should have found the difference between Opposer's Mark and the Replacement Mark to be material, and thus that Opposer had abandoned the mark shown in its registration.  The Board should therefore have cancelled Opposer's Mark, and this Court, exercising its *de novo* review of the materiality issue, should reverse the Board and cancel the Opposer's Mark now.

---

[13] Moreover, the Board's statement puts the burden on a potential opposer to try to determine which "variations" in a published mark can "be reasonably expected" in the future.

And, as noted above, the only claim of likelihood of confusion that Opposer pled in the Notice of Opposition was based on its registration.  Therefore, this Court should also reverse the Board's decision on the opposition, not only because there is no likelihood of confusion, but also because, once Opposer's registration is cancelled, there will be no cause of action left in this opposition.  This Court should therefore reverse the Board's ruling in its entirety.

## VIII.  CONCLUSION

For the foregoing reasons, the June 10, 2014 decision of the Board should be reversed, the opposition should be dismissed, and the counterclaim cancelling Opposer's Registration should be granted, along with such other and further relief as this Court deems just and proper.

Dated:   November 13, 2014              Respectfully submitted,

                                        FROSS ZELNICK LEHRMAN & ZISSU,

                                        By:/s/ Richard Z. Lehv
                                            Richard Z. Lehv
                                            Robert A. Becker
                                            866 United Nations Plaza
                                            New York, New York  10017
                                            (212) 813-5900 (Telephone)
                                            (212) 813-5901 (Facsimile)
                                            rlehv@fzlz.com
                                            rbecker@fzlz.com

                                            *Attorneys for Appellant*

# ADDENDUM

# TABLE OF CONTENTS

**Addendum Page**

Decision of
United States Patent and Trademark Office
Trademark Trial and Appeal Board
Sustaining Opposition and Dismissing Counterclaim
    dated June 10, 2014 ............................................................................ Add. 1

*RA Brands*, *L.L.C. v. Pure Fishing*, *Inc.*,
    Opp. No. 91120088, 2002 WL 1022539 (T.T.A.B. May 15, 2002) ....Add. 28

*Red Bull GmbH v. American Baseball Co.*,
    Opp. Nos. 91150958 & 91150961 (T.T.A.B. May 21, 2004) ..............Add. 34

*Big O Tires*, *Inc. v. 67 & Latham*, *L.L.C.*,
    Opp. Nos. 91178685 & 91178688 (T.T.A.B. Nov. 18, 2008) .............Add. 60

THIS OPINION IS NOT A
PRECEDENT OF THE TTAB

Mailed:
June 10, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*New Millennium Sports, S.L.U.*
*v.*
*Jack Wolfskin Ausrustung fur Draussen GmbH & Co. KGaA*

———

Opposition No. 91195604

———

Philip R. Bautista of Taft Stettinius & Hollister LLP for New Millennium Sports, S.L.U.

Robert A. Becker and Richard Z. Lehv of Fross Zelnick Lehrman & Zissu, P.C. for Jack Wolfskin Ausrustung fur Draussen GmbH & Co. KGaA.

———

Before Taylor, Ritchie and Masiello, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

Jack Wolfskin Ausrustung fur Draussen GmbH & Co. KGaA ("applicant") filed an application[1] to register the mark set forth below for a variety of goods in International Classes 9, 18, 20, 22, and 25:



---

[1] Application Serial No. 77823794, filed on September 10, 2009 under Trademark Act § 44(e), 15 U.S.C. § 1126(e) on the basis of German Registrations Nos. 1080617, 39403831, 39548615, and 1098932.

Opposition No. 91195604

The application states, "The mark consists of a nonhuman paw print."  Color is not claimed as a feature of the mark.

New Millennium Sports, S.L.U. ("opposer") opposed registration of the mark for the goods in International Class 25 only.  Applicant's goods in Class 25 are the following:

> Clothing, namely, pullovers, sweaters, sweatshirts, shirts, blouses, t-shirts, polo shirts, jackets, parkas, anoraks, coats, wind cheaters, vests, pants, shorts, underwear, ski wear, ski pants, ski suits, swimwear and beachwear, scarves, gloves, belts, waterproof and weatherproof clothing, namely, windproof and waterproof jackets, down vests, down jackets, weatherproof jackets, waterproof pants, fleece jackets, fleece shorts, fleece pullovers, ski pants, fleece pants, fleece sweaters, waterproof hats, fleece mittens, boots lined with wool, waterproof snow boots, waterproof hiking shoes, weatherproof hiking boots, weatherproof trekking boots and waterproof shoes; footwear, namely, boots, shoes, sandals, sport shoes, slippers; headgear, namely, hats, headbands and caps.

Opposer brings its opposition under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that applicant's mark, as used in connection with those goods, so resembles opposer's registered mark set forth below[2] as to be likely to cause confusion, mistake or deception.



Opposer's mark is registered for the following goods:

> clothing; namely, track suits, trousers, shorts, vests, shirts, sweat shirts, stockings, socks, rainwear,

---

[2] Reg. No. 1856808 issued on October 4, 1994; Section 8 affidavit accepted; Section 15 affidavit acknowledged; renewed.

2

Opposition No. 91195604

> waistcoats; footwear; namely, sport shoes, boots, and
> slippers; headgear; namely, caps and hats.

In answering the notice of opposition, applicant admitted that the earliest date of use of its mark that it can rely on is September 10, 2009,[3] which is the filing date of the opposed application.  Applicant denied the other salient allegations of the notice of opposition.  Applicant also stated a counterclaim for cancellation of opposer's pleaded registration on the ground that opposer has abandoned use of the registered mark.[4]  Opposer denied all allegations of the counterclaim.  The case has been fully briefed.

I.    <u>The record</u>.

The record includes the pleadings and, by operation of Trademark Rule 2.122, 37 C.F.R. § 2.122, the application file for the opposed mark and the file history of the registration that is the subject of the counterclaim for cancellation.

The parties stipulated that "Any documents produced by the parties in response to requests for production of documents or interrogatories shall be deemed admissible and are made of record in this proceeding…. Objections to admissibility of such documents are hereby waived."[5]  The documents were identified by page numbers on a schedule attached to the stipulation, but they were not attached to the stipulation.  Opposer filed some of the identified documents (consisting of a one-

---

[3] Answer and Counterclaim, ¶ 5.

[4] Applicant also stated affirmative defenses of waiver, estoppel, and failure to state a claim upon which relief can be granted.  Applicant did not pursue those defenses and they are deemed waived.

[5] Stipulation filed October 16, 2012, TTABvue # 43; stipulation accepted October 31, 2012, TTABvue # 44.

3

Opposition No. 91195604

page affidavit of opposer's chief executive officer Carlos Garcia Cobaleda; and advertising and marketing materials of opposer) as an attachment to its main brief, which recited the terms of the stipulation in its description of the record. Applicant in its main brief, filed thereafter, also recited the terms of the stipulation and stated "Applicant does not dispute Opposer's description of the evidence of record" and "Neither party has raised any objections to the evidence of record."[6] Even though the materials attached to opposer's brief should have been filed under a notice of reliance during opposer's testimony period, in view of the terms of the stipulation and the lack of any objection by applicant, we will consider them.

The record also includes the following testimony and evidence:

A.    Opposer's evidence.

1.    Printouts of information from the electronic database records of the Patent and Trademark Office showing the current status and title of opposer's pleaded registration, filed with the notice of opposition. TTABvue # 1.

2.    Testimony deposition of Duarte Da Silveira, president and chief executive officer of Kelme North America, LLC. TTABvue # 49.

3.    Notice of reliance of January 13, 2013, including applicant's responses to certain interrogatories and USPTO records relating to applicant's cancelled U.S. Reg. No. 2760796. TTABvue # 46.

4.    Rebuttal notice of reliance of June 13, 2013, including materials duplicative of those filed with the January 13, 2013 notice of reliance. TTABvue # 54.

B.    Applicant's evidence.

1.    Notice of reliance on opposer's written responses to selected interrogatories, document requests and requests for admission. TTABvue # 50.

---

[6] Applicant's brief at 2. *See also id.*, fn1.

4

Opposition No. 91195604

2.    Notice of reliance on information relating to third-party registrations and applications.  TTABvue # 51.

3.    Notice of reliance on printouts of certain internet web pages. TTABvue ## 52-53.

II.    <u>Standing</u>.

Opposer has properly made of record its pleaded registration and has demonstrated its use of a paw print design in connection with the sale of its goods.[7] Opposer has thus shown that it is not a mere intermeddler and has established its standing to oppose registration of applicant's mark.  *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); and *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

Applicant has standing to bring its counterclaim for cancellation of opposer's registered mark on the basis of opposer's assertion of its mark and registration against applicant in the notice of opposition.  *See Ohio State University v. Ohio University*, 51 USPQ2d 1289, 1293 (TTAB 1999) ("[A]pplicant's standing to assert the counterclaim arises from applicant's position as a defendant in the opposition and cancellation initiated by opposer.").  *See also Finanz St. Honore B.V. v. Johnson & Johnson*, 85 USPQ2d 1478, 1479 (TTAB 2007).

III.    <u>Applicant's counterclaim</u>.

We begin by considering applicant's counterclaim for cancellation of opposer's pleaded registration.

---

[7] Da Silveira Exhibits 3-12.

Opposition No. 91195604

A claim for cancellation of a registration may be filed at any time if the registered mark has been abandoned. 15 U.S.C. § 1064(3). A mark is considered abandoned when "its use has been discontinued with intent not to resume such use"; and "nonuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. Because registrations are presumed valid under the law, the party seeking to cancel a registration on the ground of abandonment must rebut this presumption of validity by a preponderance of the evidence. *See On-Line Careline Inc. v. America Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471 (Fed. Cir. 2000); and *Cerveceria Centroamericana S.A. v. Cerveceria India Inc.*, 892 F.2d 1021, 13 USPQ2d 1307 (Fed. Cir. 1989). If the claimant makes a *prima facie* case of abandonment, the burden of production then shifts to the registration holder to rebut the *prima facie* showing with evidence. *Id.*

Applicant contends that opposer "ceased using the mark shown in [its pleaded registration] in 2004, nine years ago";[8] and that since 2004 opposer has used a different mark that is "materially different in character from" the registered mark,[9] with no intention to resume use of the registered form of the mark. Opposer admits in its brief that since 2004 it has used its mark in the form shown below:[10]



---

[8] Applicant's brief at 28.

[9] *Id.* at 29.

[10] Opposer's brief at 8.

Opposition No. 91195604

Opposer has also admitted that its use of this version of the mark has continued throughout the period of 2005 to 2011.[11]  For purposes of comparison, we reproduce the registered form of the mark below:



A change in the form in which a registered mark is used, accompanied by cessation of use of the original form with no intent to resume use thereof, may constitute abandonment of the registered mark if the change constitutes a "material alteration." *Paris Glove of Canada Ltd. v. SBC/Sporto Corp.*, 84 USPQ2d 1856, 1861 (TTAB 2007).[12]  "A change in the form of a mark does not constitute abandonment or a break in continuous use if the change neither creates a new mark nor changes the commercial impression of the old mark." *Id.*, citing J. Thomas McCarthy, 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §17:26 (4th ed. 2007).  In order to avoid a finding of material alteration, "[t]he modified mark must contain what is the essence of the original mark, and the new form must create the impression of being essentially the same mark." *Visa International Service Association v. Life-Code Systems, Inc.*, 220 USPQ 740, 743 (TTAB 1983).

---

[11] Opposer's responses to requests for admission Nos. 8-14, TTABvue # 50.

[12] *See also General Foods Corporation v. Ito Yokado Co., Ltd.*, 219 USPQ 822, 825 fn.10 (TTAB 1983) (stating, in *dicta*, "Abandonment may result from a material change in the registered mark, i.e., such that the mark being used is not the registered mark but a different mark.").

Opposition No. 91195604

Applicant argues:

> [T]he design shown in Opposer's Mark [as registered],
> rather than being interpreted by consumers as a paw,
> might be interpreted by consumers in one of at least four
> other ways – as a mountain with the sun's rays, a volcano,
> a setting sun, or an abstract design.  By contrast, both
> parties agree that the design shown in Opposer's
> Replacement Mark would be interpreted as a paw.[13]

Applicant argues, quoting TMEP § 1609.02(a), that "The general test of whether an alteration is material is whether, if the mark in an application for registration had been published, the change would require republication in order to present the mark fairly for purposes of opposition."[14] Applicant points out:

> [In 2004] there were 7 registrations or applications for
> marks in Class 25 that included depictions of paws with
> nails or claws, and of those 7 registrations or applications,
> 2 consisted only of depictions of paws with nails or claws.
> It would have been perfectly rational for the owners of
> these 7 registrations and applications to have wanted to
> oppose registration of Opposer's Replacement Mark, even
> if they had not wanted to oppose registration of Opposer's
> Mark.[15]

Opposer argues that its modified mark "creates the same commercial impression as the Original Mark":[16]

> The Original Mark and the Modernized Mark both
> contain the word element KELME, with each letter being
> solid and capitalized.  Both marks have paw print
> elements to the right of the KELME word element that
> are the same height as the capital letters of the KELME
> word elements and that are solid.  Both marks have paw

---

[13] Applicant's reply brief at 6.

[14] Applicant's main brief at 29.

[15] *Id*. at 30-31 (citations to the record omitted).

[16] Opposer's rebuttal brief at 5.

> print elements with top and bottom portions that begin
> and end on the same plane as the top and bottom portions
> of the KELME lettering.    Both marks have solid,
> triangular-shaped palmar/plantar paw pads.  Both marks
> have solid, four oval-shaped digital pads that are
> similarly oval-shaped, the same size, and that are
> similarly oriented around the palmar/plantar pad.[17]

Opposer also points out that when it submitted a combined affidavit of use

and application for renewal of its registration,[18] accompanied by specimens of use

showing the mark in its modified form, the Patent and Trademark Office accepted

the same and renewed the registration.[19]

After careful review, we find that the modified version of opposer's mark does

not constitute a material alteration.  With respect to the style of the lettering, we

note that the style shown in the registration is relatively non-distinctive, and the

style in which the letters are now presented is also highly conventional.  The literal

element of the mark, KELME, is far more distinctive than the lettering in which it

is presented, and we find that the impression that it creates is not materially

affected by a change in the style of the letters.

As the parties have noted, the primary change to the mark is the addition of

nails or claws to the "paw" design to the right of the word KELME.  We are not

persuaded by applicant's claim that the design, as registered, would be interpreted

as something other than a paw.  If the design resembles in any way a mountain, a

volcano, or a setting sun, it does so only in a very vague way.  On the other hand,

---

[17] *Id.*

[18] Affidavit under § 8 and request for renewal under § 9, filed October 14, 2004.

[19] Notice of acceptance and notice of renewal, issued November 16, 2004.

Opposition No. 91195604

the design resembles a paw print with reasonable clarity and conforms to conventional concepts of what an animal's paw or paw print would look like. *See*, for example, the third-party registrations shown in applicant's Exhibits HH and KK, for marks that are described, respectively, as an "animal paw" and a "dog's paw," and both of which, like opposer's design, consist primarily of a rounded triangle with four irregular ovals:[20]

 

We expect that customers would likely interpret opposer's design as a paw.

Graphically, the newly added claws are a very small component of the overall design, relative to the other elements of the design. Moreover, inasmuch as it is common knowledge that an animal's paws are accompanied by claws, the addition of a visual indication of the claws does not materially alter the impression conveyed by the design. It appeared to be a paw before, and now it still appears to be a paw. In other ways – the size and position of the paw relative to the wording – the mark is essentially unchanged. The fact that the shapes that compose the paw design have been made somewhat more regular and symmetrical makes little overall

---

[20] U.S. Reg. Nos. 3614300 and 3894401, applicant's notice of reliance TTABvue #51, Exhibits HH and KK. Numerous other similar examples can be seen in the same notice of reliance.

Opposition No. 91195604

impression.  The original paw design was reasonably close to symmetrical and the modified form of the mark is only slightly more balanced.

The rule of thumb invoked by applicant – the hypothetical question of whether a proposed amendment to a mark that had already been published would warrant republication in order to present the mark fairly for purposes of opposition – reflects policy concerns that are relevant to the question before us.  In this case, we do not find that the changes to opposer's mark would warrant republication. The publication of the original mark would have put interested persons on notice that the mark included a representation of an animal's paw.  The changes in the modified version of the mark are typical of the variations to be reasonably expected in representations of animals' paws.[21]

We have given no weight to the fact that the Post-Registration Division of the Patent and Trademark Office granted the request for renewal of opposer's registration.  That renewal did not deprive applicant of its right to petition for cancellation of the registration on grounds of abandonment and to have its claim determined by the Board.

We find that the essence of the original mark is present in the mark as modified; that the modified mark creates the impression of being essentially the same mark; and that the commercial impression of the old mark has not been changed.  Accordingly, we find that the differences between the mark that opposer currently uses and the mark that appears in its registration do not constitute a

---

[21] *See*, for example, the various representations of paws used by third parties shown in applicant's notice of reliance at TTABvue ## 52 and 53.

11

material alteration of the registered mark. Accordingly, applicant has not shown that opposer has abandoned use of its registered mark. Applicant's counterclaim for cancellation is dismissed.

IV.    Opposer's claim under Section 2(d).

We turn now to opposer's claim under Trademark Act § 2(d) on the ground of priority and likelihood of confusion.

In view of opposer's ownership of a valid and subsisting registration of its pleaded mark, priority is not in issue with respect to the mark and goods identified in that registration. *King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

Our determination of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.* 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

A.    The parties' goods.

Turning first to the similarity or dissimilarity of the goods at issue, we find that the parties' goods are, in part, identical. Opposer's registration and the opposed application both cover sweatshirts; shirts; vests; shorts; footwear, namely, boots, sport shoes, and slippers; and headgear, namely, hats and caps. Moreover, the goods identified as "trousers" and "rainwear" in opposer's registration are at least closely related in nature to the goods identified in the application as "pants"

12

and "waterproof and weatherproof clothing, namely, windproof and waterproof jackets, … weatherproof jackets, [and] waterproof pants."

We need not address the similarity between opposer's goods and each and every one of applicant's identified goods. In the context of likelihood of confusion, it is sufficient if likelihood of confusion is found with respect to use of the mark on any item that comes within the description of goods in a given International Class in the application or registration. *Tuxedo Monopoly, Inc. v. General Mills Fun Group*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981); *Apple Computer v. TVNET.Net, Inc.*, 90 USPQ2d 1393, 1398 (TTAB 2007). Accordingly, the *du Pont* factor relating to the similarity of the goods favors a finding of likelihood of confusion.

B.    The parties' channels of trade.

We next consider the parties' established and likely-to-continue trade channels. To the extent that the parties' goods are identical (*i.e.*, sweatshirts; shirts; vests; shorts; boots, sport shoes, and slippers; hats and caps), we must presume that the parties' goods move through the same channels of trade. *See American Lebanese Syrian Associated Charities Inc. v. Child Health Research Institute,* 101 USPQ2d 1022, 1028 (TTAB 2011); *In re Smith and Mehaffey,* 31 USPQ2d 1531, 1532 (TTAB 1994); *In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012).[22] As there are no limitations as to channels of trade in the identifications of goods in the registration and application, we presume that the parties' goods move in all channels of trade normal for such goods. *See Octocom*

---

[22] Applicant admits as much in its brief at 26 ("[A]s a matter of law the parties' trade channels … will be presumed to be the same or similar….")

Opposition No. 91195604

*Syst. Inc. v. Houston Computers Svcs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *Paula Payne Products Co. v. Johnson Publishing Co.*, 473 F.2d 901, 177 USPQ 76 (CCPA 1973); *In re Linkvest S.A.*, 24 USPQ2d 1716, 1716 (TTAB 1992).    Opposer's witness testified that its trade channels included casual wear retailers, sporting goods retailers, wholesalers, secondary distribution vendors, and the internet.[23]    Applicant has stated that its potential trade channels are stores operated by applicant, shop-in-shop systems, third-party stores, and online stores.[24]

Applicant contends, however, that the similarity of trade channels "does not mean that this factor weighs in Opposer's favor."[25]    Applicant argues that "consumers understand that clothing stores sell clothing from many manufacturers. Consumers who go to a clothing store and see numerous brands are not going to believe that they come from the same source."[26]    We are not persuaded.    If two marks are confusingly similar, the fact that they may be found in the same channels of trade would increase the likelihood of customer confusion.    Accordingly, this *du Pont* factor weighs in favor of a finding of likelihood of confusion.

C.    <u>Customers; Conditions of sale</u>.

We next consider "the conditions under which and the buyers to whom sales are made." *du Pont* at 567.    Because the parties' goods are in part identical, we must presume that the classes of customers at issue are the same.    *See In re Viterra*

---

[23] Da Silveira 40:23-41:21.

[24] Applicant's response to interrogatory No. 2, opposer's notice of reliance at TTABvue # 46.

[25] Applicant's brief at 26.

[26] *Id.* at 26-27.

14

*Inc.,* 101 USPQ2d at 1908.   Opposer describes the customers of both parties as "average purchasers" who "are unlikely to exercise a great deal of care" in purchasing the goods.[27]   Clearly the universe of customers for the parties' goods is very broad and includes all members of the general public having an interest in purchasing goods such as sweatshirts, sport shoes, and hats.  In addition, nothing in the record suggests that purchasers of such goods have any special degree of sophistication.  However, applicant argues:

> [The goods at issue] are mostly articles of clothing that constitute important purchases, not merely because they often cost more than $100, but also because they are the types of goods that consumers do not soon replace by purchasing similar items.   And they are the types of products that consumers know they will have to take the time to return if they do not fit. … These simply are not casual impulse purchases.[28]

> [The goods] feature a variety of footwear, outerwear, and trousers that must fit and are expensive, often purchased with the help of a salesman, often expressions of the wearer's personal style, and purchased infrequently. They are not "casual, everyday items," and must be purchased with care, not on impulse.[29]

> To buy either party's products, a consumer will usually interact with a salesperson and take the time to try on the item, particularly if the item is a pair of athletic shoes. Usually the consumer does not just go into a store aisle, pick up a product, and bring it to the cash register.  The general sales model often entails assistance, and this assistance minimizes confusion.[30]

---

[27] Opposer's brief at 18-19.

[28] Applicant's brief at 19.

[29] *Id.* at 21.

[30] *Id.* at 26.

15

Opposition No. 91195604

We are not persuaded by applicant's characterization of the conditions of purchase. It is true that some of the parties' goods, such as footwear, may cost more than $100 and require some deliberation in order to select the correct size and fit. However, other goods of applicant, such as t-shirts, caps, and headbands are relatively inexpensive and may well be selected without special care. Neither are we persuaded that the assistance of a salesperson would be an inevitable aspect of a sale of the goods.

Considering that the relevant customers would include ordinary consumers using an average degree of care, and that the conditions of sale would not necessarily entail increased deliberation or the assistance of sales personnel, we find this *du Pont* factor to be neutral or slightly favoring a finding of likelihood of confusion.

D.    <u>The marks at issue</u>.

We next consider the similarity or dissimilarity of the marks at issue in terms of appearance, sound, meaning, and overall commercial impression. We base our determination on a consideration of the marks in their entireties. *In re National Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985). *See also Franklin Mint Corp. v. Master Mfg. Co.,* 667 F.2d 1005, 212 USPQ 23, 234 (CCPA 1981). However, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *In re*

16

Opposition No. 91195604

*National Data Corp.*, 224 USPQ at 751; *see also Price Candy Company v. Gold Medal Candy Corporation,* 220 F.2d 759, 105 USPQ 266, 268 (CCPA 1955).

Applicant points out that opposer's registered mark includes the "fanciful" term KELME; that this term constitutes the dominant portion of opposer's mark; and that this dominant portion is absent from applicant's mark.[31] Applicant points out that its mark consists only of a design that would be immediately recognizable as a paw (including claws), while the design in opposer's mark could be perceived as something else, in part because it is rendered in less detail and lacks any representation of claws. Applicant contends that opposer's design looks like something drawn by a child; that if it is perceived to be a paw, it would be the paw of a harmless pet, whereas applicant's design depicts the paw of "an animal that … has not been domesticated." Applicant points out that its design is oriented at an angle, that it is generally "realistic," as opposed to the "schematic" quality of opposer's design, and that it is "obviously not symmetrical," as opposed to the symmetry of opposer's design.[32]

It is clear that the KELME component of opposer's mark creates a visual and phonetic impression that is absent from applicant's mark. However, even if we assume that KELME constitutes the dominant portion of the mark, the design component standing to the right of the term KELME is a salient, distinctive feature of the mark which must be given due consideration. Opposer contends that

---

[31] Applicant's brief at 5-7.

[32] *Id.* at 7-9.

applicant's mark is confusingly similar to this design and, for that reason, is likely to cause confusion as to the source of applicant's goods.

We give relatively little weight to the fact that in applicant's mark, the paw is presented at an angle, in contrast to the vertical presentation of opposer's design element. Even though the owner of a trademark may intend that the mark be displayed only at one approved angle, in the marketplace customers may encounter marked materials such as labels, packages, hangtags and even signs in a variety of orientations. This fact would tend to reduce the impact on customers of the "approved" angle of the mark.

Considering other purely visual aspects of the two designs, we note that opposer's design includes a large, rounded, triangular shape surmounted by four smaller, slightly irregular ovals. In applicant's mark there is a corresponding rounded triangular shape that is more irregular and less symmetrical than the triangle in opposer's mark. In opposer's mark the long axes of the four small ovals are in a radiating pattern. The ovals in applicant's mark are roughly parallel to each other. In each case the middle two ovals are positioned farther from the base line of the triangle than are the outer two ovals. Applicant's mark, unlike opposer's design, has four smaller shapes at the outer tips of the four ovals. These features of applicant's mark are completely absent from opposer's design. Despite the differences that we note here, and giving due regard to the differences noted by applicant in its brief at 5-9, the two designs have substantial visual similarities.

18

Opposition No. 91195604

With respect to the significance or connotation of the two designs, applicant has described its mark as "a nonhuman paw print";[33] and has stated that it is "immediately recognizable as a paw."[34]   As we discussed above in Section III, we find that opposer's design, also, would be perceived as a paw or paw print. Applicant's alternative interpretations of opposer's design (volcano, setting sun, mountain) are not persuasive.  Overall, we find the two designs to be similar in meaning or connotation, as both of them would be interpreted as a paw or paw print.

With respect to sound, it is obvious that neither design has any phonetic element.

We must, of course, compare the overall commercial impression of opposer's mark in its entirety, including the appearance, sound and meaning of the term KELME, with the commercial impression created by applicant's mark.  We find that applicant's mark creates a commercial impression that is substantially similar to that of opposer's mark, as it resembles in many respects the design component of opposer's mark.  Companies that use marks consisting of a word plus a logo often display their logos alone, unaccompanied by the literal portions of their trademarks. Indeed, opposer has demonstrated that it sometimes displays its paw design (in its modified form) separate and apart from the KELME designation.[35]   Applicant's mark could therefore be interpreted by customers as a display of opposer's design,

---

[33] Application, description of the mark.

[34] Applicant's brief at 7.

[35] Da Silveira Exhibit 3 (top of shoe box); Exhibit 7 (cover of 2007 "soccer" catalogue); Exhibit 8 (cover of 2007 "indoor" catalogue).

19

Opposition No. 91195604

apart from opposer's word element.  *See In re United States Shoe Corp.*, 229 USPQ

707, 709 (TTAB 1985) ("Applicant's mark would appear to prospective purchasers to

be a shortened form of registrant's mark.").  Accordingly, we find that the *du Pont*

factor of the similarity or dissimilarity of the marks favors a finding of likelihood of

confusion.

E.    <u>Similar marks in use</u>.

In accordance with *du Pont*, we consider any evidence of record regarding

"the number and nature of similar marks in use on similar goods." *du Pont* at 567.

Applicant has submitted substantial evidence relating to "paw" trademarks that

have been registered[36] and used[37] in connection with clothing.  Applicant argues:

> [C]onsumers are aware that the presence of a paw as or in
> a mark is not sufficient to allow them to determine the
> origin of the product sold under those marks.  Consumers
> realize that in order to determine the origin of the
> products, they must look to differences between the paws
> and additional indicia of origin, both in the marks and
> elsewhere, on the products. … This dilution of paws in
> marks in Class 25 in the U.S. thus substantially lessens
> the likelihood of confusion.[38]

For purposes of demonstrating the weakness of a mark, we generally give

little weight to third-party registrations, because they are not evidence that the

marks are in use.  *Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La

Michoacana Inc.*, 98 USPQ2d 1921, 1934 (TTAB 2011).  In this case, we note that

applicant has demonstrated through internet evidence that many of the registered

---

[36] Applicant's notice of reliance at TTABvue # 51.

[37] Applicant's notice of reliance at TTABvue ## 52-53.

[38] Applicant's brief at 16.

Opposition No. 91195604

marks are in use at least in internet advertisements. Accordingly, we will focus on this internet evidence, which has been marked as applicant's Exhibits A through BB.[39]

The most relevant examples of third-party use are Exhibits A-D and F, as these appear to show "paw" trademarks in the parties' fields of footwear, sportswear, outer wear, and casual wear. Of these, only the mark in Exhibit F resembles opposer's design, although the paw is enclosed in a stylized heart. The marks in Exhibits A-D are quite different, in that four of them have five digits and all of them have very prominent claws:



A          B          C                    D                    F

The differences in style and detail in these marks limits the extent to which they would have a diluting impact on the distinctiveness of opposer's mark.

The great majority of the internet evidence relates to apparel bearing paw designs that are associated with universities, high schools and their athletic teams. Exhibits J through BB. The evidence shows at least 19 of these designs, some of which quite closely resemble opposer's design. *See, e.g.*, Exhibits K (Clemson University), M (Bates College), Q (Ohio University), V (Eastern Illinois University), and Z (Princeton High School).

---

[39] Applicant's notice of reliance at TTABvue ## 52-53.

            

Clemson U.         Bates College         Ohio U.         Princeton High School

Others among these marks are quite different from opposer's design. *See, e.g.*, Exhibits N (University of Maine – five digits, prominent claws); R (University of Montana – five long digits, long claws, M design on palm); S (University of South Dakota – SD monogram in center of one-piece paw); U (St. Vincent College – vertical claw marks across the pad of the paw); Y (Towson University – tiger stripes across paw); AA (Barron Collier High School – two paws); and BB (Palmetto Ridge High School – five digits, prominent claws, PR monogram on palm).

We find it significant that the marks in Exhibits J-BB are displayed on apparel primarily in an ornamental fashion: that is, they are emblazoned on the apparel in large format and in prominent placement such as on the chest of a shirt or on the side of the leg of a pair of pants. Moreover, it is clear that these marks are displayed for the purpose of showing an association with particular colleges, high schools, and their sports teams, rather than to identify an apparel company or a sporting goods company. In other words, these marks "tell[ ] the purchasing public … not the source of manufacture but the secondary source" of the goods, *In re Paramount Pictures Corporation*, 213 USPQ 1111, 1112 (TTAB 1982) (in the present case the secondary sources being educational institutions or athletic teams). This is most apparent on those college or high school websites that, in offering apparel marked with the school or team mark, also identify the actual

22

manufacturers of the goods.  *See, e.g.*, Exhibits L (Under Armour hat, U-Trau boxers, Jansport sweatpants); N (Jansport and Russell t-shirts, U-Trau boxers, Boxercraft capris pants, *etc.*); P (Hurley board short); Q (Champion t-shirts, sweatshirts, pants, Nike t-shirt); S (Adidas hoops short, Russell t-shirt, Jansport sweatshirt, *etc.*); T (Champion t-shirts and sweatshirts, Cutter & Buck polos, *etc.*); U (Jansport t-shirts, *etc.*); W (Champion and Under Armour t-shirts, Jansport pants); Z (sweatshirts by Jerzees, Independent Trading Co., and Bella+Canvas); BB (District Threads sweatshirt, Port & Company t-shirt).  Inasmuch as the college, high school and athletic team marks perform the function of secondary source indicators rather than conventional marks of apparel companies, their impact on the distinctiveness of opposer's apparel trademark is somewhat reduced.

Similarly, the marks shown on apparel in Exhibits E, G, H and I appear to be used primarily as secondary source indicators for businesses offering pet-related goods and services.

We note also that, while many of the paw designs in Exhibits A through BB consist of variations of the "pad plus four digits" format that is seen in opposer's design, they are displayed together with other distinguishing matter, such as college names or acronyms, monograms, and distinctive graphic details.  In this regard, these designs, as actually presented to the marketplace, are substantially more distinct from opposer's mark than is the mark that applicant wishes to register, which has no wording and only very subtle graphic details to distinguish it from opposer's design.

Opposition No. 91195604

In view of the foregoing, we find that the *du Pont* factor of the number and nature of similar marks in use on similar goods is neutral.

F.    <u>The fame of opposer's mark.</u>

Opposer maintains that its mark is "well-known and famous."[40]  Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection.  A famous mark has extensive public recognition and renown.  *Bose Corp. v. QSC Audio Products Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).  Because of the extreme deference that we accord a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark is famous to clearly prove it.  *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007).

For purposes of a claim of likelihood of confusion, fame arises if a "significant portion of the relevant consuming public … recognizes the mark as a source indicator."  *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed Cir. 2005).  Fame for likelihood of confusion purposes may be measured indirectly by the volume of sales of the goods or services sold under the mark, advertising expenditures, and other factors such as

---

[40] Opposer's brief at 20.

Opposition No. 91195604

length of time of use of the mark; widespread critical assessments; notice by independent sources of the products identified by the marks; and the general reputation of the products and services. *Bose Corp.*, 63 USPQ2d at 1308.

Opposer argues that for more than a decade it has advertised and sold its goods to "thousands of retail sellers of athletic apparel and footwear," including "major retail sellers"; and that "annual sales of goods bearing the Mark have historically been robust."[41]  Opposer has made of record select information relating to the dollar value of sales of goods under the mark.[42]  The information disclosed is very limited and shows opposer's sales to be very modest.  There is testimony indicating that opposer's goods have had some degree of exposure at the Wimbledon tennis tournament and the Olympics, and to have been worn by the Spanish national soccer team, Real Madrid Soccer Club, and some well-known soccer players.[43]  However, that testimony is quite vague and lacking in essential detail. Opposer has submitted no evidence regarding its advertising expenditures.

After careful consideration, we find that opposer has not demonstrated fame for purposes of a likelihood of confusion analysis.  Accordingly, we find the *du Pont* factor of fame to be neutral.

G.   Absence of actual confusion.

Opposer has admitted that it has no knowledge of any instance of actual confusion involving the parties' marks.  On the other hand, applicant has admitted

---

[41] *Id.  See also id.* at 10-11; and applicant's rebuttal brief at 7-9.

[42] Da Silveira 39:5-12.  *See also* Cobaleda affidavit, filed with opposer's brief on the case.

[43] Da Silveira 45:15-46:16.

Opposition No. 91195604

that it "does not sell goods under Applicant's Mark in the U.S.";[44] and that it has "no current channels of trade for goods sold under Applicant's Mark in the U.S."[45] Although applicant's responses to interrogatories indicate that it formerly did business in the United States, the extent of that business is not apparent on this record. Thus, there is no indication that there has been a meaningful opportunity for confusion to occur. Under the circumstances, we find the lack of evidence of actual confusion to be a neutral factor in our analysis of likelihood of confusion. *Cf. Citigroup Inc. v. Capital City Bank Group, Inc.,* 94 USPQ2d 1645, 1660 (TTAB 2010), *aff'd,* 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011).

H.    Balancing the factors.

The record indicates that the parties' respective marks are substantially similar; that their goods are identical in part; and that both parties offer or intend to offer their goods through similar trade channels to ordinary consumers who exercise an ordinary degree of care. Applicant has shown that that there is some presence in the marketplace of other paw marks. Opposer has not shown its mark to be famous. There are no known instances of actual confusion.

We have considered all of the evidence of record and all arguments of the parties relevant to the issues before us, including those not specifically discussed herein. Our analysis of the *du Pont* factors leads us to find that applicant's mark, as used in connection with the identified goods, so closely resembles opposer's

---

[44] Opposer's notice of reliance at TTABvue # 46, applicant's response to interrogatory No. 1.

[45] *Id.,* applicant's response to interrogatory No. 2.

Opposition No. 91195604

registered mark as to be likely to cause confusion, mistake or deception as to the source of applicant's goods.

**Decision:**

The opposition is sustained as to applicant's goods in International Class 25 and registration is refused as to those goods.  After expiration of the applicable appeal period, the application will be permitted to proceed with respect to the goods in International Classes 9, 18, 20, and 22.

Applicant's counterclaim for cancellation is dismissed.

27

2002 WL 1022539 (Trademark Tr. & App. Bd.)

THIS DISPOSITION IS NOT CITABLE AS PRECEDENT OF THE T.T.A.B.

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

RA BRANDS, L.L.C.

v.

PURE FISHING, INC. [1]

May 15, 2002

**\*1**  Opposition No. 120,088 to application Serial No. 75/671,704 filed on March 31, 1999

Randel S. Springer of Womble Carlyle Sandridge & Rice, PLLC for RA Brands, L.L.C.

Lance G. Johnson of Roylance, Abrams, Berdo & Goodman, L.L.P. for Pure Fishing, Inc.

Before Seeherman, Walters and Wendel
Administrative Trademark Judges
Opinion by Wendel
Administrative Trademark Judge

Berkley, Inc. (by change of name to Pure Fishing, Inc.) has filed an application to register the mark BERKLEY CATCH MORE FISH and design, as depicted below,



for the following goods:

| | |
|---|---|
| Class 7: | Battery-operated hook sharpening machines and fishing line strippers; |
| Class 8: | Fishing hand tools, namely, pliers, fishing knives, scissors, hook files, crimpers, line cutters, and manually-operated line spooling machines; |
| Class 9: | Fishing tools, namely, weigh scales; |
| Class 16: | Printed matter in the form of labels and decals; |
| Class 25: | Shirts, caps, hats, jackets, coats and windshirts; |

| Class 26: | Embroidered emblems; |
|---|---|
| Class 28: | Fishing rods; fishing reels; fishing line; artificial fishing lures; artificial fishing baits; fish attractants; fishing tackle, namely, fishing hooks, leaders used for fishing, fishing leader kits, downriggers, swivels, snap swivels, snaps, knotless fasteners, connector sleeves; fishing rod racks; fishing rod holders; tackle boxes; fishing rod cases; sportsperson's fishing bags; and ice fishing strike indicators; |
| Class 36: | Financial sponsorship of fishing, golf and tennis tournaments. [2] |

**\*2**  RA Brands, L.L.C. has filed an opposition to registration of the mark on the ground of priority of use and likelihood of confusion under Section 2(d) of the Trademark Act. [3]  In the notice of opposition, opposer alleges use since at least as early as January 1994 by opposer and its predecessor-in-interest, Remington Arms Company, of a design mark for a stylized fish together with a stylized fishing line in connection with opposer's products which include fishing tackle, fishing line, fishing hooks, fishing leaders and flying discs, along with clothing and cloth patches for clothing; ownership of a registration for the mark, [4] in which the design is shown as follows;



and likelihood of confusion with applicant's use of its mark, which opposer alleges is to be used with identical or closely related goods and which allegedly contains a stylized depiction of a fish that is strikingly similar to that of opposer's mark.

Applicant, in its answer, has denied the salient allegations of the notice of opposition. [5]

<u>The Record</u>

The record consist of the pleadings; the file of the involved application; opposer's testimony deposition, with accompanying exhibits, of Alfred D. Russo, Jr.; applicant's responses to certain of opposer's interrogatories, together with the exhibits provided as part of those responses, made of record by opposer's notice of reliance; and the stipulated testimonial declaration of applicant's witness Mark V. Sparacino, with accompanying exhibits.

Both parties filed briefs, but an oral hearing was not requested.

<u>Facts</u>

The evidence establishes that in the early to mid 1990s, opposer's predecessor, Remington Arms Company, hired an agency to redesign the packaging for the seven brands of fishing line which were Remington's only products at the time. One of the designs which the agency suggested as a single logo to distinguish all of Remington's fishing products was the stylized fish design which is the subject of this opposition. Mr. Russo testified that at the time the fish design was selected the agency reported, after making a competitive audit of stores and other brands of fishing line, that there was no one in the field using a stylized fish. (Deposition p. 49).

Remington began using the stylized fish design by at least October 1994. Since introduction of the design mark, Remington has not sold any of its STREN line of fishing products without the design mark. Remington does not use the fish design alone, but rather in conjunction with its STREN word mark. (Deposition p. 58). Remington obtained a registration for its design mark on March 18, 1997 and the registration was later assigned to opposer, an intellectual property holding company, which licensed the mark back to Remington.

Opposer sells its products, and particularly fishing line, in mass merchant outlets such as Wal-Mart and Kmart, in regional chains such as Dick's Sporting Goods, in small retail outlets such as tackle shops, in gas stations and through catalog merchants. The products for the most part are displayed on wall pegs in the stores. Opposer and applicant are direct competitors in the fishing line products market. Opposer and applicant share approximately 80% of the market for these products, with applicant being the market leader at 43-45% and opposer having 35-37% of the market. Applicant markets its products in the same manner as opposer and thus applicant's products are often displayed on pegs in the same stores side-by-side with opposer's products. Opposer's most popular-selling fishing line ranges in cost from $5 to $8 and the comparative products of applicant fall within the same price range.

**\*3** Opposer's main advertising of its products featuring its fish design mark is by means of magazines and television. The magazines are targeted towards fishermen or outdoorsmen, either on a national or regional level. The advertisements feature both the STREN word mark and the stylized fish design. Opposer's advertising budget runs several million dollars per year. Opposer also promotes its STREN line of fishing products at trade shows, consumer shows, tournament fishing shows, fishing clinics and the like.

Applicant filed its application on the basis of an intent to use the mark and, although it states in its brief that its mark has been in use since March 1999, applicant has introduced no evidence of actual use of the mark. Opposer, however, has introduced testimony that opposer became aware of applicant's use of its mark approximately 18 to 24 months prior to the taking of the deposition in July 2001.

<u>Discussion</u>

Priority is not an issue here in view of opposer's ownership of its pleaded registration. [6] See King Candy Co. v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). In addition, opposer's witness Mr. Russo has testified to the use of the stylized fish mark at least by October 1994, a date well prior to applicant's filing of its intent-to-use application on March 31, 1999.

Turning to the issue of likelihood of confusion, we take into consideration all of the *du Pont* factors which are relevant under the present circumstances and for which there is evidence of record. See E.I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

Insofar as the respective goods are concerned, we find a definite overlap in both the fishing products and the clothing items of the parties. The remaining goods and services of applicant are closely related to opposer's goods. Applicant has in fact acknowledged that its goods and services compete directly with those of opposer. Thus, for purposes of our analysis the goods and services are considered identical in part and otherwise closely related.

Furthermore, there are no restrictions in the goods and/or services as identified in the application and registration as to the channels of trade or the class of purchasers. Because there are no such limitations, it must be presumed that the goods and/or services of both would travel in all the normal channels of trade and be available to all the usual purchasers of goods and/or services of this type. See Canadian Imperial Bank v. Wells Fargo Bank, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987). Mr. Russo has testified that applicant and opposer are the two top competitors in the field and that the goods of both are offered for sale in the same retail outlets and are often displayed side-by-side.

While applicant contends that this side-by-side display affords the prospective purchaser the opportunity for comparison and distinction of both the products and the marks associated therewith, we are not convinced that the purchasers of these types of fishing products, and particularly of fishing line, would take the time or effort to so carefully examine the marks being used by the competitors. Although Mr. Russo has testified as to the availability of different types of fishing line and different equipment according to regional fishing needs, these fishing products remain relatively inexpensive items which are purchased without any great degree of forethought or consideration, other than perhaps purchasing the right type of fishing line for a particular fisherman's need. While purchasers may have become more sophisticated as to the variety of products available in the field, we do not consider this sophistication sufficient to prevent likelihood of confusion as to the source of the goods if confusingly similar marks are used on the competing products.

*4  Thus, we come to the factor which is highly determinative in our analysis, namely, the similarity or dissimilarity of the respective marks. Opposer's basic argument is that its stylized fish design and the fish design of applicant's mark convey the same overall visual impressions and any small differences in the designs would not be remembered by purchasers. While acknowledging the additional presence of the words BERKLEY CATCH MORE FISH in applicant's mark, opposer argues that purchasers will still think that applicant's goods are sponsored by or are in some way related to opposer in view of the similarity of the two fish designs. Opposer cites the statement made by the predecessor of our present reviewing court (the CCPA) in its decision in Finn v. Cooper's Inc., 292 F.2d. 555, 130 USPQ 269 (CCPA 1961) that:

This court has expressly rejected the argument that one may imitate the picture part of a trademark of another, and avoid the likelihood of confusion, mistake, or deception of purchasers by using different word trademarks in association with the symbol mark.

130 USPQ at 273.

Applicant, in response, argues that the marks must be considered in their entireties. [7] Applicant contends that opposer's comparison of the mutilated marks, looking only at the fish portion of applicant's mark, is not the proper basis for analysis. [8] In making a detailed comparison of the marks, applicant points not only to differences such as the presence of fishing line in opposer's mark and not in applicant's and the facing of the fish in opposite directions, but also to many smaller differences in the depiction of the fish themselves. In addition, applicant notes the prominent appearance of the house mark BERKLEY in its mark, as well as the words CATCH MORE FISH.

Applicant also argues the suggestiveness of the fish design when consideration is given to the fishing products with which the marks are being used. Applicant refers to the declaration of Mark Sparacino which includes as exhibits packaging of eleven third-party fishing products in which a fish, either stylized or more photographic in nature, is depicted. In addition, applicant relies upon the over 400 trademark registrations and applications made of record by opposer's notice of reliance which show marks which consist of, either in whole or part, fish designs for fishing products and services Applicant argues that given the common use of fish designs for fishing products and services, purchasers will look to the words STREN and BERKLEY that are featured, respectively, on opposer's and applicant's products as the indication of source.

When we compare the marks in their entireties, we find the overall commercial impressions of applicant's and opposer's marks to be entirely different. Opposer's mark consists solely of a stylized fish, together with a stylized fishing line. Applicant's mark is a composite mark featuring not only the house mark BERKLEY, but also the slogan, CATCH MORE FISH. The fish design element of applicant's mark is of minimal significance in the overall impression. Moreover, the fish design itself is clearly not a replica or imitation of opposer's particular design.

*5  Of even more importance is the fact that a fish design in general is highly suggestive when used in connection with fishing products, as demonstrated by the evidence of record. The exhibits attached to the declaration of Mark Sparacino specifically show use by third parties of similar fish designs in connection with fishing products. The third-party registrations, while not

Add. 31

evidence of use of the marks or public familiarity therewith, are evidence that fish designs have appealed to others as a trademark element in the field of fishing products and services and that the designs are not particularly distinctive but rather have a suggestive significance in the field. See Bost Bakery, Inc. v. Roland Industries, Inc., 216 USPQ 799, 801, n.6 (TTAB 1982). Contrary to opposer's contention that this third-party evidence is irrelevant because, opposer claims, most of these designs are not remotely similar to opposer's mark, we find this evidence highly persuasive of what little significance purchasers would attach to the fish design element of applicant's composite mark.

Moreover, the circumstances in the *Finn* case relied upon by opposer are distinctly different from those here. In that case the petitioner's design mark consisted of a representation of a jockey and respondent's mark consisted of the words JERRY FINN and a representation of a hitching post in the form of a jockey. Both marks were being used in connection with clothing. The Board, in Cooper's Inc. v. Finn, 124 USPQ 10 (TTAB 1959), found the jockey figure in respondent's mark to be entirely arbitrary as applied to wearing apparel and to be of such prominence as to create a commercial impression separate and apart from the name JERRY FINN. Thus, the Board determined the figure alone might well be relied upon by purchasers in identifying the source of the goods, and in view of the similarity to petitioner's figure mark, might lead purchasers to assume that respondent's goods originated with, or were in some way associated with, petitioner.

The CCPA upheld the decision of the Board. Finn v. Cooper's Inc, *supra.* The Court emphasized the commercial significance which petitioner's mark had acquired well before respondent's adoption of a similar symbol "as the dominant part of the registered mark." 130 USPQ at 273. It was under these conditions that the Court applied the principle cited by opposer that one could not "imitate" the symbol or "picture part" of another one's trademark and avoid likelihood of confusion by using a different word mark in conjunction with the symbol.

In this case, however, applicant's fish design is clearly not arbitrary when used in connection with fishing products and related services. Furthermore, applicant's fish design is but a small insignificant portion of its mark as a whole and does not create a commercial impression separate and apart from the composite mark. Thus, there is no reason for purchasers to attribute a common source to the fishing products of applicant and opposer based solely on any similarity of the fish designs.

 **\*6** Despite opposer's arguments that its fish design is well-know and that millions of dollars have been spent advertising and promoting this mark, we cannot place opposer's stylized fish design per se in the category of a well-known mark. As acknowledged by Mr. Russo, the design mark is always used in conjunction with the STREN word mark. Although there may have been large advertising expenditures and extensive use of the composite mark of which the fish design is a part, there is no evidence of record of separate use or promotion of the fish design. There is no evidence to support any contentions that the fish design alone is well-known or would be recognized by purchasers as what opposer describes as "a unifying icon" for its products. In addition, as pointed out previously, applicant's fish design is not an imitation or close replica of opposer's fish design. All in all, no parallel can be drawn to the circumstances in the *Finn* case.

As a final factor for consideration, opposer raises the question of applicant's intent in adopting its mark, arguing that applicant intended to trade on the goodwill of opposer by selecting its similar fish design. While we would agree that applicant most certainly was aware of opposer's mark, which had been used since 1994 in the same markets and for the same type of fishing products, we can draw no further inferences as to applicant's intent in adopting its mark. Moreover, since we have found that applicant's fish design is neither an imitation of opposer's mark nor a significant element of applicant's mark, we have no basis upon which to conclude that there was bad faith on the part of applicant. Opposer, having failed to introduce any direct evidence to support its claim, has not established that applicant's adoption of its mark was knowingly done with the intention of trading on the goodwill of opposer's mark.

Accordingly, upon taking all the relevant *du Pont* factors into consideration, we find the balance to fall on the side of no likelihood of confusion. Regardless of the fact that the goods and/or services of the parties are either identical or closely related and the markets are the same, the marked differences in the commercial impressions created by the marks as a whole, taken

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

in conjunction with the highly suggestive nature of a fish design when used with fishing products or related services, clearly tips the scale in applicant's favor.

Decision: The opposition is dismissed.

Footnotes

1    The caption of this proceeding was amended by the Board to reflect the change of name of the original applicant (Berkley, Inc.) which was recorded with the Assignment Branch of the Office at reel 2181, frame 814.

2    Serial No. 75/671,704, filed March 31, 1999, based on an allegation of a bona fide intention to use the mark in commerce.

3    Although opposer also makes a general allegation of dilution in the notice of opposition, opposer has failed to pursue this ground. Accordingly, we have given it no consideration.

4    Registration No. 2,046,114, issued March 18, 1997, for the mark shown above for the following goods:

| Class 25: | Clothing and apparel, namely, shirts, hats and jackets; |
| Class 26: | Cloth patches for clothing; and |
| Class 28: | Sporting goods, namely, fishing tackle, fishing line, fishing hooks, fishing leaders and flying discs. |

The registration contains a description of the mark as "the design of a stylized fish and stylized fishing line artistically arranged to suggest the fish is chasing the line or is hooked by it."

5    We note that applicant has attached to its answer exhibits which are alleged to show widespread use of stylized fish images by others as, or in connection with, marks for goods used for fishing. No consideration has been given to these exhibits, inasmuch as exhibits to pleadings are not evidence on behalf of the party to whose pleading the exhibits are attached. See Trademark Rule 2.122 (c). Only those materials introduced by applicant during its testimony period have been taken into consideration.

6    In order to make a pleaded registration of record, an opposer must either make a status and title copy of the registration of record or introduce testimony as to the status and title of the registration. We note that during the testimony of Mr. Russo with respect to the pleaded registration, he specifically stated that the registration had been transferred from the original registrant, Remington Arms Company, to opposer RA Brands. Thus, current title was established. Mr. Russo gave no direct testimony as to the current status of the registration. In its brief, however, applicant has acknowledged the registration as being of record. Furthermore, the copy introduced as Exhibit 1 by Mr. Russo was taken from the U.S. Trademark Electronic Search System (TESS) and has the information on its face that the registration was "live" as of the last update of the system, which was July 10, 2001, the date of the deposition. Under these circumstances, we find that opposer has satisfied the requirement with respect to establishing both current title and status of the registration.

7    Applicant, in its arguments, has addressed not only the pleaded fish design of opposer, but also the composite of the fish design and the word STREN, this being the manner in which opposer uses the fish design. Opposer, however, has only pleaded use and registration of the fish design and thus for purposes of this opposition we consider only the fish design. It is well accepted that a party may use more than one mark at the same time and thus we find no reason to consider the fish design other than as a separate mark.

8    While applicant makes a point of demonstrating that small differences exist between the fish design as actually used by opposer and the registered mark, we find these differences insignificant in our comparison of applicant's and opposer's marks.

2002 WL 1022539 (Trademark Tr. & App. Bd.)

End of Document    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

THIS DISPOSITION IS NOT
CITABLE AS PRECEDENT
OF THE TTAB

Mailed:
May 21, 2004

Paper No. 20
Bottorff

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

### Trademark Trial and Appeal Board

_____

Red Bull GmbH
v.
American Baseball Company, Inc.

_____

Opposition No. 91150958
to application Serial No. 76201394
filed on January 29, 2001

_____

Opposition No. 91150961
to application Serial No. 76201393
filed on January 29, 2001

_____

Martin R. Greenstein of TechMark a Law Corporation for Red
Bull GmbH.

Robert B. Famiglio of Famiglio & Associates for American
Baseball Company, Inc.

_____

Before Bucher, Bottorff and Holtzman, Administrative
Trademark Judges.

Opinion by Bottorff, Administrative Trademark Judge:

The above-captioned opposition proceedings were

consolidated by order of the Board dated January 22, 2003.

The cases are now ready for decision, and shall be decided

**Opposition Nos. 91150958 and 91150961**

by the Board in this single opinion, which shall be entered
in the proceeding files of both proceedings.

In application Serial No. 76201394 (involved in
Opposition No. 91150958), applicant seeks registration on
the Principal Register of the mark BULL NECK (in typed form)
for goods identified in the application as "leather sports
equipment, namely baseball gloves," in Class 28.  In
application Serial No. 76201393 (involved in Opposition No.
91150961), applicant seeks registration of the mark PLAY
BALL WITH THE BULL (in typed form) for the same goods.  Both
applications are based on applicant's asserted bona fide
intention to use the respective marks in commerce, under
Trademark Act Section 1(b), 15 U.S.C. §1051(b).

Opposer has opposed registration of both of applicant's
marks, alleging as its ground of opposition in both cases
that opposer is the prior user of the corporate name, trade
name and trademark RED BULL on and in connection with
various non-alcoholic beverages including energy drinks and
sports drinks, and on or in connection with other products
and services relating to or complementary to its beverages,
including sports equipment; that opposer is the owner of
Registration No. 2494093, which is of the mark RED BULL for
goods and services in numerous classes, including Class 28;
that opposer also owns "various trademarks for and which
include the word BULL, as well as the design or logo of a

Opposition Nos. 91150958 and 91150961

Bull" for the aforesaid goods and services; and that each of applicant's marks, as applied to the goods identified in the applications, so resembles opposer's marks as to be likely to cause confusion, to cause mistake, or to deceive. Trademark Act Section 2(d), 15 U.S.C. §1052(d).

In each case, applicant filed an answer by which it essentially denied the salient allegations of the notices of opposition.[1]

At trial, opposer presented evidence, but applicant did not. Both parties filed main briefs, and opposer filed a reply brief.[2] No oral hearing was requested. For the reasons discussed below, we dismiss the opposition in each case.

The evidence of record consists of the pleadings; the files of the opposed applications; status and title copies of five registrations owned by opposer, submitted by opposer via notice of reliance;[3] and printouts of articles and other

---

[1] Applicant's answers also include allegations of various affirmative defenses which either are not legally cognizable in an opposition proceeding or which, in any event, were not established at trial. We have given these allegations no consideration.

[2] Opposer's motion to extend the time for filing its reply brief is granted.

[3] In the two notices of opposition, opposer specifically pleaded only one registration, Reg. No. 2494093. The other four registrations submitted via notice of reliance were not pleaded by number. *See* Trademark Rule 2.106(b)(1). However, because applicant in its brief has treated the unpleaded registrations as being of record and at issue, we deem the pleadings in each of the oppositions to be amended to include the additional

3

materials downloaded from the Internet by opposer's attorney, submitted by opposer via notice of reliance.[4]

The five registrations made of record by opposer in support of its Section 2(d) claim are:

- Registration No. 2494093, which is of the mark RED BULL (in typed form) for goods and services in eighteen classes.[5]  Opposer relies particularly on the following goods and services identified in the registration:  "balls for … baseball" in Class 28; "sports drinks" and various other non-alcoholic beverages in Class 32; "promoting sports events and competitions for others" in Class 35; and "sports competitions, namely, baseball and football games" in Class 41;

---

registrations.  *See* Fed. R. Civ. P. 15(b); *Time Warner Entertainment Co. v. Jones,* 65 USPQ2d 1650, 1653 n.2 (TTAB 2002).

[4] Materials downloaded from the Internet are not self-authenticating "printed publications" which may be made of record via notice of reliance.  *See* Trademark Rule 2.122(e), 37 C.F.R. §2.122(e); *Plyboo America Inc. v. Smith & Fong Co.*, 51 USPQ2d 1633, 1634 n.3 (TTAB 1999); *Raccioppi v. Apogee Inc.*, 47 USPQ2d 1368, 1370 (TTAB 1998).  However, because applicant has not objected to these materials but instead has treated them as being of record and at issue, we deem applicant to have waived any objection to the admissibility of these materials, and we deem them to be of record.  *See Conde Nast Publications Inc. v. Vogue Travel, Inc.*, 205 USPQ 579, 580 n.5 (TTAB 1979); TBMP §704.08 at n.204 (2d ed. June 2003).  However, we have given the materials only so much probative value as they deserve.  In particular, these documents are admissible and probative only for what they show on their face, not for the truth of the matters asserted therein.  *See, e.g., Harjo v. Pro-Football Inc.*, 50 USPQ2d 1705, 1721 n.50 (TTAB 1999); TBMP §704.08 at n.201 (2d ed. June 2003).

[5] Issued October 2, 2001, pursuant to Trademark Act Section 44, 15 U.S.C. §1126.  No use in commerce is alleged as to any of the goods and services, which are in Classes 3, 5, 12, 14, 16, 18, 20, 25, 26, 28, 29, 30, 32, 34, 35, 39, 41 and 42.

Opposition Nos. 91150958 and 91150961

- Registration No. 1935272, which is of the mark RED BULL (in typed form) for "malt liquor" in Class 32;[6]

- Registration No. 2579008, which is of the mark BULL (in typed form) for various nonalcoholic beverages including "energy and sports drinks" in Class 32;[7]

- Registration No. 2560956, which is of the mark ENERGY BULL (ENERGY disclaimed) for goods and services in Classes 32, 33 and 42, including "sports drinks; energy drinks; isotonic drinks, hypertonic drinks and hypotonic drinks, for use and/or as required by athletes and those engaged in active or stressful sports and activities" in Class 32, and "technical consultation and research services in the field of food and beverages, health and fitness, sports, sports training and physical performance" in Class 42;[8] and

- Registration No. 2524020, which is of the mark SPEEDY BULL for goods in Classes 32, 33 and 34, including "sports drinks; energy drinks; isotonic drinks, hypertonic drinks and hypotonic drinks, for use and/or as required by athletes

---

[6] Issued November 14, 1995 to Stroh Brewery Company and later assigned to opposer; affidavits under Section 8 and 15 accepted and acknowledged.  The registration is based on use in commerce, and September 1985 is alleged as the date of first use and first use in commerce.

[7] Issued June 11, 2002.  The registration is based on use in commerce, and alleges January 1987 as the date of first use, and January 1996 as the date of first use in commerce.

[8] Issued April 16, 2002, pursuant to Trademark Act Section 44, 15 U.S.C. §1126.  No use in commerce is alleged.

**Opposition Nos. 91150958 and 91150961**

and those engaged in active or stressful sports and activities" in Class 32.[9]

Because opposer has made of record status and title copies of its registrations, we find that opposer has established its standing to oppose.  *See, e.g., Lipton Industries, Inc. v. Ralston Purina Company*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).  Also, Section 2(d) priority is not at issue in this case with respect to the marks and the goods and/or services covered by opposer's registrations. *See King Candy Co., Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).  We turn now to the Section 2(d) issue of whether a likelihood of confusion exists as between applicant's marks and any of the registered marks made of record by opposer.

Our likelihood of confusion determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the likelihood of confusion factors set forth in *In re E. I. du Pont de Nemours and Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).  In considering the evidence of record on these factors, we keep in mind that "[t]he fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."

---

[9] Issued January 1, 2002, pursuant to Trademark Act Section 44, 15 U.S.C. §1126.  No use in commerce is alleged.

6

*Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d
1098, 192 USPQ 24, 29 (CCPA 1976).

Before we discuss the relevant *du Pont* factors, we must
address two contentions by opposer regarding its Internet
evidence, which appear to underlie opposer's likelihood of
confusion arguments to a large extent.  Specifically,
opposer argues that the Internet materials made of record
via notice of reliance establish two facts which support a
finding of likelihood of confusion.  First, opposer
contends, the materials establish that there exists a "close
association" in the public's mind between opposer's RED BULL
energy drink and "baseball and baseball-related activities."
Second, opposer contends, the materials establish that the
press and the purchasing public commonly refer to opposer
and/or to opposer's RED BULL energy drink by the shortened
nickname "the Bull."  Aside from the hearsay problems with
this evidence, we are not persuaded that the evidence
establishes either of these contentions.

The fact that opposer was able to locate seven Internet
articles or postings which happen to mention both baseball
and opposer's RED BULL beverage product does not establish
that there is any particular association between the two in
the public's mind which would create or enhance a likelihood
of confusion.  These articles refer only incidentally or
tangentially to opposer's product, and always with reference

Opposition Nos. 91150958 and 91150961

to its caffeine content, not to any connection between the

product and the sport of baseball, per se.[10]  To the extent

---

[10]    The posting on WebMD.com is an article about a completely
different product, i.e., a caffeine/ephedrine dietary supplement
called "Ripped Fuel," and its potential drawbacks when used by
professional baseball players.  The article closes as follows:

> Every baseball season, one supplement or another
> becomes popular, Stout says.  "Right now, for
> instance, the Boston Red Sox are all drinking Red
> Bull," says Stout, who says …"I don't have any
> problem with that, because it is really only ginseng
> tea and is harmless.  There isn't any ingredient in
> it that can improve their performance, but they
> think it does, so maybe it helps."

> Red Bull, according to its web site, is a high-
> energy drink made from the amino acid taurine and
> also contains caffeine.

The article's statement that "the Boston Red Sox are all drinking
Red Bull" clearly is hearsay and not proof of the matter
asserted.  In any event, the statement appears in the article in
the context of a discussion about professional baseball players'
use of dietary supplements generally; it does not prove opposer's
contention that there is a "close association" in the public's
mind between baseball and opposer's product in particular.
    The October 29, 2002 article from the <u>Orange County Register</u>
is about the Anaheim Angels' 2002 World Series victory
celebration rally which was held at the ballpark and attended by
100,000 fans.  Opposer's Red Bull product is mentioned only in
passing, in the context of a discussion of how advertisers were
using the rally as a marketing opportunity:  "It was a banner day
for advertisers who used small airplanes to get their messages
across, while others handed out freebies to lure potential
customers.  A woman handing out Red Bull energy drinks from the
back of a sport utility vehicle rubbed her hands, cold from
digging into the ice and pulling out the beverage.  'Do you want
a Red Bull?' she asked."
    The July 3, 2002 posting on the East Coast Sports Network
website mentions Red Bull only in passing, and in connection with
late-night viewing of World Cup soccer, not baseball:  "Well,
after a month of staying up 'til all hours of the night to watch
the World Cup (my thanks to the man who invented Red Bull)…"
                                          *(footnote cont. next page)*
    The posting on the strikethree.com website discusses many
baseball topics, and includes a mention of Red Bull only at the
end, in the "About the author" tagline:  "Michael Cox is now
officially really, really tired.  Send Red Bull to [him], and
make it snappy."

that the Internet evidence might be deemed to show any
connection at all between opposer's energy drink and the
sports world, it is with respect to opposer's sponsorship of
"extreme" sports competitions and events such as
snowboarding, big mountain skiing, kitesurfing, street luge,
endurance cycling and cliff diving, not baseball.

Nor does opposer's Internet evidence establish that the
public commonly refers to opposer or its products as "the
Bull."  There are seven postings which refer to opposer's
product as "the Bull" or "Bull," most of which use that term
only as part of a clever or punning headline;[11] in the text
of these articles, opposer's product is called "Red Bull."
In any event, these usages of "the Bull" or "Bull" are in
reference only to opposer's energy drink, which is already

---

The posting on the mlb.com website is an hour-by-hour
recounting of two fans' "quest to make it to all 30 ballparks in
50 days."  At 4:21 a.m. of Day One, the two fans make their only
reference to Red Bull:  "I think I see the sun rising in the
distance.  We may stay up late every night hopped up on Red Bull
writing quirky leads about pine tar and the hour-to-hour
deterioration of our sanity…"
    The August 23, 2003 article on espnmag.com includes, buried
deep in its text, the following rather random reference to Red
Bull:  "My violin's in the shop, or else I'd be playing it like
Charlie Daniels after six Red Bull vodkas…"
    A similarly random reference to Red Bull appears in the
August 24, 2001 article from the Las Vegas Mercury about Cal
Ripken's consecutive games streak:  "…I believe some of us would
work 2,632 consecutive days if we were earning that kind of money
and even show up on time if we had stayed out the night before
drinking Red Bull and vodka at Studio 54 until 3 a.m."

[11] Examples are:  "It's a (Red) Bull Market After All"; "Running
of the Bull: How the Brand Got Hot"; "Get the Bull about 'Red
Bull'"; "A Bull Market"; "The Rage Over the Bull"; and "The Bull
Witch Project."

covered by opposer's Registration No. 2579008 of the mark
BULL.  The evidence does not show use of "the Bull" or
"Bull" in reference to any of the other goods or services
covered by opposer's registrations.

In short, the Internet evidence submitted by opposer
fails to prove opposer's contentions that there is a close
association in the public's mind between opposer or its
products and the sport of baseball, or that the public
commonly refers to opposer or its products as "the Bull" or
"Bull."  The evidence does not affect our likelihood of
confusion analysis in any material way, nor does it expand
the scope of protection to be accorded each of opposer's
registered marks.

We turn now to the question of whether any of the
registrations made of record by opposer suffices as a
Section 2(d) bar to registration of applicant's marks.  We
shall consider each of opposer's registrations in turn.[12]

Opposer's Registration No. 2494093 is of the mark RED
BULL for, inter alia, "balls for … baseball" in Class 28,
"sports drinks" and various other non-alcoholic beverages in
Class 32, "promoting sports events and competitions for

---

[12] To the extent that opposer's arguments in its briefs might be
construed as a claim that opposer owns a family of "bull" marks,
we are not persuaded.  Mere ownership of multiple registrations
with a common word or feature does not create a family of marks.
*See, e.g., J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d
1460, 18 USPQ2d 1889 (Fed. Cir. 1991); *Consolidated Foods*

others" in Class 35, and "sports competitions, namely, baseball and football games" in Class 41. Applicant's application Serial No. 76201394 seeks registration of the mark BULL NECK for "leather sports equipment, namely baseball gloves," in Class 28.

We first must determine whether applicant's mark and opposer's mark, when compared in their entireties in terms of appearance, sound and connotation, are similar or dissimilar in their overall commercial impressions. The test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the goods offered under the respective marks is likely to result. The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Sealed Air Corp. v. Scott Paper Co.,* 190 USPQ 106 (TTAB 1975). Furthermore, although the marks at issue must be considered in their entireties, it is well-settled that one feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the commercial impression created by the mark. *See In re*

---

*Corporation v. Sherwood Medical Industries Inc.*, 177 USPQ 279 (TTAB 1973).

Opposition Nos. 91150958 and 91150961

*National Data Corp.*, 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985).

In terms of appearance and sound, opposer's RED BULL mark and applicant's BULL NECK mark are similar to the extent that both marks include the word BULL, but dissimilar insofar as BULL is the second word in opposer's mark and the first word in applicant's mark.  Opposer argues that the word BULL is an arbitrary term as applied to opposer's goods, and that it therefore is the dominant feature in the commercial impression of its RED BULL mark and so should be accorded greater weight in our comparison of the marks.  We are not persuaded.  Although BULL is an arbitrary term, we cannot ignore the word RED in opposer's mark, which likewise is an arbitrary term and is an integral component in the commercial impression of opposer's mark.  Viewed as a whole, opposer's mark is a unitary phrase or expression, denoting a red-colored bull.[13]  Applicant's mark BULL NECK likewise is a unitary expression with a well-understood meaning; it is a noun denoting "a thick short powerful neck."  <u>Webster's</u>

---

[13] Opposer argues that the Internet evidence it has submitted, which includes instances of the public's use of the term "bull" in reference to opposer's product, shows that BULL is the dominant feature in the commercial impression of opposer's mark. We are not persuaded.  At best, this evidence shows that the word "bull" lends itself to punning headlines and references, such as "bull market."  See *supra* at footnote 11.

Opposition Nos. 91150958 and 91150961

Ninth New Collegiate Dictionary (1990) at 186.[14]  The
commercial impression created by applicant's mark is not of
a red-colored bull (nor of a bull of any other color), but
rather is of the human anatomical feature known as a "bull
neck."

The only point of similarity between the marks is that
they both include the word BULL.  That point of similarity
is outweighed by the distinctly different manners in which
the word appears and is used in the respective marks.
When we consider the two marks in their entireties, as we
must, we find that they have distinctly different
connotations and that they create quite dissimilar overall
commercial impressions.  Opposer's contention that the marks
are similar because they both include the word BULL rests on
an improper dissection of the marks.  Thus, we find that the
first *du Pont* factor, i.e., the similarity or dissimilarity
of the marks, weighs in applicant's favor in our likelihood
of confusion analysis.

We turn next to the issue of the similarity or
dissimilarity of the parties' goods, under the second
*du Pont* factor, and to the related issue of the similarity
or dissimilarity of the normal trade channels and classes of

---

[14] The Board may take judicial notice of dictionary definitions.
*See, e.g., University of Notre Dame du Lac v. J. C. Gourmet Food
Imports Co.,* 213 USPQ 594 (TTAB 1982), *aff'd,* 703 F.2d 1372, 217
USPQ 505 (Fed. Cir. 1983).

13

purchasers for such goods, under the third *du Pont* factor.
In making this determination, it is not necessary that the
respective goods or services be identical or even
competitive in order to support a finding of likelihood of
confusion.  Rather, it is sufficient that the goods or
services are related in some manner, or that the
circumstances surrounding their marketing are such, that
they would be likely to be encountered by the same persons
in situations that would give rise, because of the marks
used thereon, to a mistaken belief that they originate from
or are in some way associated with the same source or that
there is an association or connection between the sources of
the respective goods or services.  *See In re Martin's Famous
Pastry Shoppe, Inc*., 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir.
1984); *In re Melville Corp.,* 18 USPQ2d 1386 (TTAB 1991); *In
re International Telephone & Telegraph Corp.*, 197 USPQ2d 910
(TTAB 1978).

Applicant's goods are "leather sports equipment, namely
baseball gloves," in Class 28.  The Class 28 goods in
opposer's registration include "balls for … baseball."
Opposer's baseballs and applicant's baseball gloves are
obviously complementary, related items which normally are
marketed in the same trade channels (such as sporting goods
stores and the sporting goods department of department
stores) and to the same classes of purchasers.  We find that

these goods are sufficiently related that source confusion
is likely to occur if the goods were to be marketed under
confusingly similar marks.  As to these Class 28 goods in
opposer's registration, therefore, we find that the second
and third *du Pont* factors weigh in opposer's favor.

We find, however, that the other goods and services
identified in opposer's registration and upon which opposer
relies for its Section 2(d) claim, i.e., "sports drinks" and
various other non-alcoholic beverages in Class 32,
"promoting sports events and competitions for others" in
Class 35, and "sports competitions, namely, baseball and
football games" in Class 41, are dissimilar and unrelated to
applicant's baseball gloves, for purposes of Section 2(d).
Unlike opposer's baseballs, these goods and services of
opposer's are not sporting goods items which are self-
evidently similar or related to applicant's "baseball
gloves," and there is no evidence in the record which would
support a finding that any such relationship exists.

Opposer's services include promoting and staging sports
competitions, including baseball games.  However, there is
no evidence that opposer or any other provider of such
services also markets or permits others to market baseball
gloves under the same or a similar mark, or that any
manufacturer or marketer of baseball gloves provides the
services recited in opposer's registration.  There is no

**Opposition Nos. 91150958 and 91150961**

basis in the record for finding that purchasers would expect
or assume that baseball gloves originate from, or are
sponsored or approved by, the provider of such services.
Baseball gloves are highly specialized pieces of sports
equipment which normally are sold only in sporting goods
stores and in the sporting goods departments of department
stores.  There is no evidence that baseball gloves normally
are sold or distributed (or ever sold or distributed) at
baseball games or exhibitions, either as sports equipment or
as souvenir items.  Even assuming that spectators or
participants in the baseball games and exhibitions provided
by opposer might also own baseball gloves, or even might use
them while attending or participating in such baseball games
and exhibitions, that fact does not suffice to establish
that they are likely to assume that a source, sponsorship or
other relationship exists between baseball gloves and
baseball games or exhibitions which are offered under
confusingly similar marks.

Likewise, the evidence of record simply does not
support a finding that purchasers are likely to assume that
a source relationship exists between opposer's "sports
drinks" and applicant's baseball gloves.  The goods
obviously are dissimilar in nature, one being a beverage and
the other being a specialized sporting goods item.  There is
no evidence that opposer or any other manufacturer or

16

marketer of sports drinks (or any other type of drink) also
markets or permits others to market baseball gloves under
the same or a similar mark, either as sports equipment or as
a promotional/merchandising item or collateral good.  Again,
baseball gloves are specialized sporting goods equipment
sold in sporting goods stores and in sporting goods
departments of department stores.  There is no evidence that
opposer's sports drinks are sold in such trade channels, but
even assuming that they are, there is no basis for finding
that purchasers are likely to assume that any source,
sponsorship or other relationship between such disparate
goods exists.  Finally, even assuming that sports drinks and
other beverages are consumed by spectators at baseball games
or by persons playing baseball, that fact does not suffice
to establish that such persons are likely to assume that a
source relationship exists between baseball gloves and such
beverages.  In short, there is no basis in the record for
finding that purchasers are likely to assume that baseball
gloves originate from or are sponsored by the maker of a
sports drink, or that sports drinks originate from or are
sponsored by a maker of baseball gloves.

Thus, we find that opposer has failed to establish that
applicant's baseball gloves are similar or related to the
goods and services in Classes 32, 35 and 41 upon which
opposer relies, and that the second and third *du Pont*

17

**Opposition Nos. 91150958 and 91150961**

factors (like the first *du Pont* factor) accordingly weigh in applicant's favor as to those goods and services.  We find, however, that applicant's baseball gloves are similar and related to opposer's Class 28 "balls for … baseball," and that the second and third *du Pont* factors accordingly weigh in opposer's favor as to those goods.

Upon considering all of the *du Pont* factors as to which evidence has been made of record, we find that there is no likelihood of confusion between applicant's mark BULL NECK for baseball gloves and opposer's mark RED BULL for the Class 32, 35 and 41 goods and services in opposer's Registration No. 2393093.  The respective marks are dissimilar when viewed in their entireties, and the respective goods and services have not been shown to be related or similar.

Opposer's Class 28 "balls for … baseball" are similar and related to applicant's baseball gloves.  However, for the reasons discussed above, we find that the parties' marks are too dissimilar to support a finding of likelihood of confusion, even as to goods as closely related as baseballs and baseball gloves.  The marks present distinctly different and dissimilar commercial impressions when they are viewed in their entireties, such that purchasers are not likely to be confused as to the source or sponsorship of the parties' respective goods.  The relatedness of the goods simply is

Opposition Nos. 91150958 and 91150961

outweighed by the overall dissimilarity of the marks.  *Cf.*
*Kellogg Co. v. Pack'Em Enterprises Inc.,* 14 USPQ2d 1545
(TTAB 1990), aff'd, 951 F.2d 330, 21 USPQ2d 1142 (Fed. Cir.
1991).

In short, opposer's Registration No. 2494093 does not
bar registration of applicant's BULL NECK mark for baseball
gloves.

We turn next to the issue of whether opposer's RED BULL
Registration No. 2494093 bars registration of applicant's
mark PLAY BALL WITH THE BULL.  For the reasons discussed
above, we find that the "baseball gloves" identified in
applicant's application are dissimilar and unrelated to the
Class 32, 35 and 41 goods and services upon which opposer
relies, and that they are similar and related to the Class
28 "balls for … baseball" identified in opposer's
registration.

We also find that opposer's RED BULL mark is dissimilar
rather than similar to applicant's PLAY BALL WITH THE BULL
mark.  Again, the only point of similarity between the two
marks is that both include the word BULL.  Viewing the marks
in their entireties, as we must, we find that they look and
sound different, have different connotations, and present
dissimilar overall commercial impressions.  Applicant's mark
is an alliterative unitary phrase of five words and
syllables, which does not include or connote the word RED

**Opposition Nos. 91150958 and 91150961**

(or any other color), an integral component of the
commercial impression of opposer's mark.  Likewise,
opposer's RED BULL mark lacks any reference to playing ball,
which is an integral component of the commercial impression
created by applicant's mark.  The only way that we could
conclude that these marks are similar would be if we
dissected the marks, focusing solely on the presence of the
word BULL in both marks and disregarding the obvious
differences in appearance, sound, connotation and overall
commercial impression of the respective marks.  We cannot
conclude that purchasers would dissect the marks in such a
manner; rather, we find that purchasers viewing the marks in
their entireties will readily distinguish the marks, as well
as the sources of the respective goods and services sold
under the marks.

Based on the evidence of record petaining to the
relevant *du Pont* factors, we conclude that there is no
likelihood of confusion as between applicant's PLAY BALL
WITH THE BULL mark for baseball gloves and opposer's RED
BULL mark for the Class 32, 35 and 41 goods and services
identified in opposer's registration.  Even as to the
parties' related goods, i.e., the Class 28 baseballs and
baseball gloves, we find that the marks simply are not
sufficiently similar to warrant a finding of likelihood of
confusion.  Thus, opposer's Registration No. 2494093 does

not bar registration of applicant's mark PLAY BALL WITH THE
BULL for baseball gloves.

We turn next to opposer's Registration No. 1935272,
which is of the mark RED BULL for "malt liquor" in Class 32.
For the reasons discussed above, we find that opposer's mark
RED BULL is dissimilar rather than similar to each of
applicant's marks, BULL NECK and PLAY BALL WITH THE BULL.
When the marks are viewed in their entireties, the
differences in appearance, sound, connotation and overall
commercial impression outweigh the sole point of similarity,
i.e., the presence of the word BULL in the respective marks.

We also find that applicant's baseball gloves are
unrelated and dissimilar to the "malt liquor" identified in
opposer's registration, and that the normal trade channels
for the respective goods likewise are different.  There is
no evidence that baseball gloves and malt liquor are ever
marketed by the same or a related source under the same or a
similar mark.  Even assuming that opposer is correct in
contending (without supporting evidence) that malt liquor
(as opposed to beer) is sold and consumed at baseball games,
that fact does not suffice to establish the existence of a
source, sponsorship or other relationship between baseball
gloves and malt liquor in the minds of relevant purchasers.

In short, we find that opposer's RED BULL mark is
dissimilar to applicant's BULL NECK and PLAY BALL WITH THE

21

BULL marks, and that applicant's baseball gloves are
unrelated and dissimilar to opposer's malt liquor.  No
likelihood of confusion exists, and opposer's Registration
No. 1935272 does not bar registration of either of
applicant's marks.

Next, we consider opposer's Registration No. 2579008,
which is of the mark BULL for various nonalcoholic beverages
including "energy and sports drinks" in Class 32.  For the
reasons discussed above in connection with opposer's
Registration No. 2494093, we find that opposer has failed to
establish the existence of any source, sponsorship or other
relationship between baseball gloves, the goods identified
in applicant's applications, and the sports and energy
drinks identified in opposer's registration.  There is no
evidence that opposer or any other beverage maker uses or
permits use of its marks on baseball gloves, either as
sports equipment or as promotional or collateral goods.  Nor
is there any evidence that makers of baseball gloves use
their marks on sports or energy drinks.  Even assuming that
opposer's beverages might be consumed by spectators at, or
participants in, baseball games, there simply is no basis in
the record for concluding that such purchasers are likely to
assume that the respective goods originate from or are
sponsored or approved by a single or related source.

**Opposition Nos. 91150958 and 91150961**

Applicant's marks are similar to opposer's BULL mark to
the extent that they include the word BULL, but that is the
only point of similarity.  As noted above, BULL NECK is a
unitary phrase or expression denoting a human anatomical
feature, and PLAY BALL WITH THE BULL is an alliterative
five-word phrase with a unitary meaning.  When we view the
respective marks in their entireties, as we must, we find
that they are sufficiently dissimilar that no source
confusion is likely.  This is especially so in view of the
dissimilarity of the parties' goods.

We conclude that confusion is unlikely to result from
applicant's use of either its BULL NECK or its PLAY BALL
WITH THE BULL marks on baseball gloves and opposer's use of
the mark BULL on sports and energy drinks.  Opposer's
Registration No. 2579008 accordingly does not bar
registration of either of applicant's marks.

Remaining for consideration are opposer's Registration
No. 2524020, which is of the mark SPEEDY BULL for, inter
alia, "sports drinks; energy drinks; isotonic drinks,
hypertonic drinks and hypotonic drinks, for use and/or as
required by athletes and those engaged in active or
stressful sports and activities" in Class 32, and opposer's
Registration No. 2560956, which is of the mark ENERGY BULL
(ENERGY disclaimed) for those same Class 32 goods as well as
for "technical consultation and research services in the

23

field of food and beverages, health and fitness, sports,
sports training and physical performance" in Class 42.

Viewing the marks in their entireties, we find that
applicant's BULL NECK mark is dissimilar rather than similar
to opposer's SPEEDY BULL and ENERGY BULL marks.  As was the
case in our comparison of applicant's BULL NECK mark and
opposer's other marks, the only point of similarity between
these marks is the word BULL, and that point of similarity
is outweighed by the differences in the marks' appearance,
sound, connotation and overall commercial impression.  The
same is true for applicant's PLAY BALL WITH THE BULL mark.
The mere presence of the word BULL in the marks is an
insufficient basis for finding that the marks, in their
entireties, are confusingly similar.

We also find that applicant's baseball gloves are
unrelated and dissimilar to the beverage products covered by
opposer's registrations.  It is true that these products
both might be used by athletes, including baseball players.
As discussed above, however, there is no evidentiary basis
for concluding that opposer or any other beverage maker also
markets or permits others to market baseball gloves under
the same or a similar mark, or that makers of baseball
gloves also market beverage products like opposer's.  Even
if we presume that opposer's beverages are marketed in the
same trade channels and to the same purchasers as

Add. 57

applicant's baseball gloves, the evidence of record simply does not support a finding that purchasers are likely to assume the existence of a source, sponsorship or other connection between these products.  The same is true with respect to the "technical consultation and research services in the field of food and beverages, health and fitness, sports, sports training and physical performance" recited in opposer's ENERGY BULL registration.  There is no evidentiary basis for finding that purchasers will assume that a provider of such services also markets baseball gloves, or that a baseball glove maker also provides services such as opposer's.

We conclude that there is no likelihood of confusion between either applicant's BULL NECK mark or its PLAY BALL WITH THE BULL mark for baseball gloves and opposer's SPEEDY BULL or its ENERGY BULL mark for the goods and services identified in opposer's registrations.  Accordingly, opposer's Registration Nos. 2524020 and 2560956 do not bar registration of either of applicant's marks.

In summary, we find that opposer has failed to carry its burden of proving that there is a likelihood of confusion between either of applicant's marks, as used on baseball gloves, and any of opposer's marks, as used on or in connection with the goods and services identified in opposer's registrations.  Opposer therefore has failed to

**Opposition Nos. 91150958 and 91150961**

make out its Section 2(d) ground of opposition in each of these opposition proceedings.

Decision:  Opposition Nos. 91150958 and 91150961 are dismissed.

Wolfson

UNITED STATES PATENT AND TRADEMARK OFFICE
Trademark Trial and Appeal Board
P.O. Box 1451
Alexandria, VA  22313-1451

THIS OPINION IS NOT A
PRECEDENT OF THE
T.T.A.B.

Mailed:  November 18, 2008

Opposition No. **91178685**
Opposition No. **91178688**

BIG O TIRES, INC.

v.

67 AND LATHAM, LLC

**Before Bucher, Zervas and Wellington,
Administrative Trademark Judges.**

By the Board:

Opposer, Big O Tires, Inc. has filed an opposition
against registration of the marks A BIG RIG RESORT and
DANNY'S A BIG RIG RESORT, filed by 67 and Latham, LLC, both
for "retail store services featuring convenience store items
and gasoline."[1]  Opposer asserts that the marks so resemble
opposer's "BIG O" and "BIGFOOT" marks, which opposer alleges
to have previously used or registered for goods and services
related to vehicle tires, parts and accessories, as to be
likely, when applied to applicant's services, to cause
confusion among prospective purchasers.[2]  Applicant filed an

---

[1] Serial Nos. 78815618 and 78811121.

[2] Opposer pleaded ownership of 18 registrations.  Eleven of the
registrations are for marks that include the words BIG O or
BIGFOOT.  These marks are BIG O, BIG-O, BIG FOOT 60, BIG FOOT 70,
BIG O TIRES and Design, BIG FOOT, COST U LESS BIG O TIRES and

Opposition No. **91178685** and No. **91178688**

answer denying the salient allegations in the notice of
opposition.

This case now comes before the Board for consideration
of applicant's "Motion To Dismiss Or In The Alternative, For
Summary Judgment" (filed November 30, 2007 and renewed
January 4, 2008).  The motion has been fully briefed.[3]

The parties briefed this case as a motion for summary
judgment and they have submitted matters outside the
pleadings that have not been excluded by the Board.
Accordingly, the motion has been treated as a motion for
summary judgment under Fed. R. Civ. P. 56.  See TBMP §
503.04 (2d ed. rev. 2004).

A motion for summary judgment is a pretrial device,
intended to save the time and expense of a full trial when a
party is able to demonstrate, prior to trial, that there is
no genuine issue of material fact, and that it is entitled
to judgment as a matter of law.  See Fed. R. Civ. P. 56(c);

---

Design, BIG O TIRES, WWW.BIGOTIRES.COM and Design, BIG O TIRES
LUBE CENTER, and BIGFOOT.  Opposer also pleaded ownership of
registrations for six marks consisting of a design only.  Opposer
also pleaded ownership of a registration for the mark BIG LIFT;
because that registration has been cancelled under Section 8 of
the Trademark Act, we give no further consideration to the BIG
LIFT mark.

[3] On June 17, 2008, applicant filed a contested motion, later
withdrawn, to exclude opposer's response to applicant's summary
judgment motion as untimely.  As it has been withdrawn, we have
not considered the motion.  Applicant also filed a contested
motion to extend its time to file a reply brief.  Inasmuch as
applicant timely filed its reply brief within fifteen days after
the service date of opposer's response, the motion is denied.

Opposition No. **91178685** and No. **91178688**

TBMP § 528.01 (2d ed. rev. 2004).  To prevail on its motion, applicant must establish that there is no genuine issue of material fact in dispute, thus leaving the case to be resolved as a matter of law.  See *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Opryland USA Inc. v. Great American Music Show Inc.,* 970 F.2d 847, 23 USPQ2d 1471 (Fed. Cir. 1992); and *Sweats Fashions Inc. v. Pannill Knitting Co. Inc.,* 833 F.2d 1560, 4 USPQ2d 1793 (Fed. Cir. 1987). Applicant may discharge its burden "by 'showing' - that is, pointing out to the [Board] - that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325.

Applicant's motion for summary judgment is brought on opposer's pleaded likelihood of confusion claim under Section 2(d) of the Trademark Act.  Our determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion.  *In re E. I. du Pont de Nemours & Co*., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, *In re Majestic Distilling Company, Inc*., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).  In considering the evidence of record on these factors, we keep in mind that "[t]he fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."

Opposition No. **91178685** and No. **91178688**

*Federated Foods, Inc. v. Fort Howard Paper Co*., 544 F.2d
1098, 192 USPQ 24, 29 (CCPA 1976).

As set forth in *E.I. du Pont*, *supra,* "[t]he evidentiary
elements are not listed … in order of merit" inasmuch as
"[e]ach may from case to case play a dominant role." *E.I.
du Pont,* 177 USPQ at 562. Our primary reviewing court has
made it clear that in appropriate cases, one *du Pont* factor
can outweigh all of the other factors. See *Kellogg Co. v.
Pack'em Enterprises Inc*., 14 USPQ2d 1545 (TTAB 1990), *aff'd*,
951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991). That
one factor can outweigh all others is "especially [true]
when that single factor is the dissimilarity of the marks."
*Champagne Louis Roederer v. Delicato Vineyard*, 148 F.3d
1173, 47 USPQ2d 1459, 1460 (Fed. Cir. 1998).

Applicant contends that the first *du Pont* factor, the
similarity or dissimilarity of the marks, outweighs all
other factors in this case because its marks, when compared
with opposer's, are so dissimilar in appearance, meaning,
sound, and overall commercial impression that opposer could
not prove at trial that a likelihood of confusion exists.

For purposes of its motion, applicant has conceded that
the other *du Pont* factors weigh in opposer's favor, with the
exception of the factor regarding actual confusion.[4]  The

---

[4] Opposer was permitted limited discovery on the *du Pont* factors
relating to actual confusion on grant of opposer's motion for
discovery under Fed. R. Civ. P. 56(f). In briefing this motion,

Opposition No. **91178685** and No. **91178688**

two most important of these "conceded factors" are the
factors regarding the similarity of the goods and services
and the fame of opposer's marks.

As to applicant's concession of the fame of opposer's
marks for purposes of this motion, we consider such fame to
cover not only the goods recited in opposer's registrations
but also to extend to the services identified in applicant's
applications.  We keep in mind too that the fame of a prior
mark "plays a dominant role in cases featuring a famous or
strong mark." *Century 21 Real Estate Corp. v. Century Life
of America*, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992), *quoting
Kenner Parker Toys v. Rose Art Industries Inc.*, 963 F.2d
350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

This brings us to the *du Pont* factor regarding the
similarity or dissimilarity of the marks.  We consider
opposer's BIG O and BIGFOOT (or BIG FOOT) marks of
Registration Nos. 0994466, 0993415, 1904955 and 3233881, as
they are the most similar to applicant's marks.[5]  We examine
the marks in their entireties as to appearance, sound,
connotation and commercial impression.  See *Palm Bay Imports*

---

opposer presented no evidence showing actual confusion.  We have
therefore treated this factor as neutral in our likelihood of
confusion analysis.

[5] With respect to opposer's other word marks, while they contain
additional elements, the additional elements do not add
significantly to the marks in their overall impressions.  The
additional elements are either descriptive (as in "tires," "tires
lube center," "tires cost u less," and "www.--.com") or model or
grade designations (as in "60" and "70").

*Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*,
396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005).

In appearance, the marks BIG O and BIGFOOT (or BIG
FOOT) clearly differ from the marks A BIG RIG RESORT and
DANNY'S A BIG RIG RESORT.  The only common element is the
descriptive term "big," prominently located as the first
word in opposer's marks but relegated to the middle of
applicant's marks.  The marks also differ in their aural
qualities.  Applicant's marks contain alliteration ("rig"
and "resort"), and rhyming elements ("big" and "rig").
Opposer's BIG O mark, on the other hand, contains a "pure
sound" element, the letter "O."  Neither of opposer's marks
rhyme or contain alliteration.

The main difference between the marks, however, lies in
their connotations.  The word "big" is defined, *inter alia,*
as "large or great in dimensions, bulk, or extent <a *big*
house> ; *also* large or great in quantity, number, or amount
<a *big* fleet>."  *Merriam-Webster Online Dictionary, 2008.*[6]
There is nothing in the record to suggest any particular
meaning of either of opposer's marks in the context of
tires.  The only meanings we can attribute to opposer's BIG

---

[6] Retrieved November 5, 2008, from http://www.merriam-
webster.com/dictionary/big.  The Board may take judicial notice
of standard reference works, including online reference works
which exist in printed format.  *In re Spirits International N.V.,*
86 USPQ2d 1078, 1081 n.5 (TTAB 2008).

Opposition No. **91178685** and No. **91178688**

O mark is a large letter "O" or a big tire (the letter
suggesting the tire's shape).  The marks BIGFOOT and BIG
FOOT connote a large foot, good traction of the tire on the
road, or "bigfoot," otherwise known as Sasquatch.[7]  On the
other hand, the phrase "big rig" has a distinct meaning as a
term separate and apart from the two individual words "big"
and "rig" that make up the phrase.

Applicant submitted a copy of a print-out from the
website "dictionary.com" which, citing to *Webster's New
Millennium Dictionary of English*, Preview Edition (v. 0.9.7
2008), defines the phrase "big rig" as "a tractor-trailer
truck."[8]  Thus, applicant's marks A BIG RIG RESORT and
DANNY'S A BIG RIG RESORT connote a place of relaxation for
drivers of "big rigs"; in other words, a truck stop where
drivers of tractor-trailer trucks may take a break or
purchase convenience items and gasoline.  The marks also
play on the meaning of the word "resort" as an upscale
vacation spot, "a place frequented by people for relaxation

---

[7] Merriam-Webster Online Dictionary, 2008, defines "Bigfoot" as
"[from the size of the footprints ascribed to it]:  Sasquatch,"
and further defines Sasquatch as "a hairy creature like a human
being reported to exist in the northwestern United States and
western Canada and said to be a primate between 6 and 15 feet
(1.8 and 4.6 meters) tall —called also *bigfoot.*"

[8] Opposer's objection to this dictionary entry on the ground of
authentication is overruled; applicant authenticated the
dictionary entry with its attorney's declaration, filed with
applicant's reply brief.

7

Opposition No. **91178685** and No. **91178688**

or recreation: *a ski resort*."[9]  The juxtaposition of such

connotation to an establishment that sells fuel and

convenience items to drivers of tractor-trailer trucks

creates an irony that is not found in opposer's marks.

Considering the overall commercial impressions of the

marks, again we find that opposer's marks identify an

object, suggesting in their overall commercial impression a

big foot or print as could be made by a large tire, or

Sasquatch ("Bigfoot"), or a big tire itself (the "O" being

the shape of a tire).  Applicant's marks create an entirely

different overall commercial impression.  They suggest

leisure, a place for long-haul truck drivers to stop and

rest, a "resort for big rigs."

In view of the above, we conclude that the marks are

dissimilar in sound, connotation, appearance and commercial

impression.  Further, we find that actual confusion was not

conceded or established by the evidence.[10]

Despite applicant's concession regarding the remaining

*du Pont* factors, including that the goods and services are

related and of the fame of opposer's marks, we find the

dissimilarities of the marks so great as to outweigh the

---

[9]  *The American Heritage Dictionary of the English Language:*
Fourth Edition 2000.

[10] Moreover, the relevant test under Section 2(d) is likelihood of
confusion, not actual confusion.  *Weiss Associates Inc. v. HRL
Associates Inc.*, 902 F.2d 1546, 1549, 14 USPQ2d 1840, 1842-43
(Fed. Cir. 1990), and TMEP § 1207.01(c)(iii).

Opposition No. **91178685** and No. **91178688**

other *du Pont* factors.  See *Kellogg Co. v. Pack'em, supra*
[no likelihood of confusion between mark "FROOTIE ICE" and
elephant design for packages of flavored liquid frozen into
bars and mark "FROOT LOOPS" for, *inter alia*, cereal
breakfast foods and fruit-flavored frozen confections
because -- while such goods are very closely related, move
through the same channels of trade to the same classes of
purchasers, are purchased casually rather than with care,
and despite the fact that the mark "FROOT LOOPS" is a very
strong, well known and, indeed, famous, mark -- the
respective marks differ so substantially in appearance,
sound, connotation and commercial impression that likelihood
of confusion did not exist as a matter of law].  Applicant
has shown an absence of evidence supporting opposer's claim
that confusion as to the source of applicant's services in
view of opposer's pleaded marks is likely.

Accordingly, no genuine issues of material fact remain
for trial, and applicant is entitled to judgment as a matter
of law.  Applicant's motion for summary judgment is granted
and the opposition is dismissed.


-o0o-


9

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 13th day of November, 2014, I caused this Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Philip Bautista
> Taft Stettinius & Hollister LLP
> 3500 BP Tower
> 200 Public Square
> Cleveland, Ohio 44114
> (216) 241-2838 (Telephone)
> (216) 241-3707 (Facsimile)
> pbautista@taftlaw.com
>
> *Counsel for Appellee*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Brief of Appellant will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/ Robert A. Becker
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*9,924*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: November 13, 2014          /s/ Robert A. Becker
                                  *Counsel for Appellant*